Golden Nugget, Inc.[1] v. Commissioner. Golden Nugget, Inc. v. Commissioner
Docket Nos. 2838-67, 2860-67, 2922-67, 3002-67.
United States Tax Court
T.C. Memo 1969-149; 1969 Tax Ct. Memo LEXIS 147; 28 T.C.M. (CCH) 755; T.C.M. (RIA) 69149; July 10, 1969, Filed Floyd J. Logan, for the petitioners. Robert G. Faircloth, for the respondent. DAWSON
Memorandum Findings of Fact and and Opinion DAWSON, Judge: Respondent determined the following income tax deficiencies and additions to tax against the petitioners: *10
Additions to Tax I.R.C. 1954
Petitioners
Taxable Year
Deficiency
Sec. 6651(a)
Sec. 6653(a)
Golden Nugget, Inc
April 1 to Dec. 31, 1961
$10,996.94
$549.85
W.C. and Alma G. Sanderford
1960
2,534.92
126.75
1961
548.15
27.41
1962
5,092.57
254.63
1963
7,581.32
379.07
Joe J. and Virginia Viator, Jr
1960
3,182.99
$ 795.75
159.15
1961
632.30
126.46
31.62
1962
7,600.68
380.03
1963
8,825.48
441.27
Mike and Marlene Gillich, Jr
1960
2,096.45
104.82
1961
485.59
24.28
1962
4,991.46
246.00
1963
6,469.45
323.47
*148 Petitioners in Docket No. 2922-67 have conceded the additions to tax under section 6651(a), Internal Revenue Code of 1954, [2] and the petitioners in Docket No. 3002-67 have conceded a minor adjustment of $200. The issues remaining for decision are: (1) Whether petitioners are entitled to any claimed losses from the Golden Nugget bingo operation for the period from January 1, 1960, through December 31, 1963, and, if so, the amounts of such losses; and (2) whether petitioners are liable for the additions to tax under section 6653(a) due to negligence or intentional disregard of rules and regulations. Findings of Fact Some of the facts were stipulated by the parties. The stipulation of facts and supplemental stipulation, together with the exhibits attached thereto, are incorporated herein by this reference. Golden Nugget, Inc., a corporation, was organized on April 1, 1961, with its principal office located in Handsboro, Mississippi. It filed its Federal corporation income tax return for the taxable period April 1, 1961, to December 31, 1961, with *149 the district director of internal revenue at Jackson, Mississippi. W.C. and Alma G. Sanderford, husband and wife, resided in Biloxi, Mississippi, when they filed their petition herein. Their joint Federal income tax returns for the years 1960 through 1963 were filed with the district director of internal revenue at Jackson, Mississippi. Joe J. Viator, Jr. and his wife, Virginia, resided in Biloxi, Mississippi, at the time they filed their petition herein. Their joint Federal income tax returns for the years 1960 through 1963 were filed with the district director of internal revenue at Jackson. Mike Gillich, Jr., and his wife, Marlene, resided in Biloxi, Mississippi, at the time they filed their petition herein. Their joint Federal income tax returns for the years 1960 through 1963 were filed with the district director of internal revenue at Jackson. On January 1, 1960, W. C. Sanderford, Joe J. Viator, Jr., and Mike Gillich, Jr. (herein sometimes referred to as the partners) operated a bingo game establishment in West Biloxi, Mississippi, under the name of Golden Nugget. The Golden Nugget was operated as a partnership with each of the partners owning a one-third interest therein. *150 On March 31, 1961, the business operation was incorporated as Golden Nugget, Inc. 757 On January 1, 1962, an election was made by the stockholders of Golden Nugget, Inc., to be taxed as a partnership under subchapter S of the Internal Revenue Code of 1954. The business continued to operate on that basis through December 31, 1963. The Golden Nugget was open to the public five nights a week for the period from January 1, 1960, through May 31, 1960, and from June 1, 1960, until the business closed in February 1967, it was open to the public six nights a week. The bingo games usually began about 8 p.m. The bingo operation was conducted as follows: When a player would enter the establishment, he would select bingo cards from a large pile of cards upon a table near the entrance. The player would then carry his cards to a central counter where he paid for the card or cards selected. One of the partners behind the counter would then transcribe the number of cards purchased and the serial numbers appearing at the bottom of the bingo cards to a pad. This pad contained a duplicate sheet of paper, the original sheet of which was perforated into serially numbered tickets of paper. The *151 original of the pad was then torn along the perforation and the ticket given to the player. The duplicate sheet, which was also numbered serially to correspond to each original ticket, was not perforated and was retained by the partners during the games. The number of cards on a ticket would vary from one to as many as eight, depending on the number of cards the player wished to play. This process was repeated as bingo cards were sold prior to each game series and the final game. A different color of ink was used on the player's ticket for each series to distinguish cards purchased in a prior series. The duplicate retained by the partners showed only one color, that of the carbon, or duplicating method. No money amount was ever entered on these tickets and the duplicates were not retained by the partners at the end of the night. The amount paid for the bingo cards purchased in any particular series could not be determined from the duplicate retained by the partners. When a player called bingo, one of the employees went to the player's table where he called the information on the slip of paper back to the partners at the counter to verify that the card used by the player calling bingo *152 was a card for which payment had been made. These tickets were used solely for the protection of the players and were not used for bookkeeping in any way. Each night the bingo operation normally consisted of the following: FIRST SERIES: Each bingo card was sold for two dollars, which gave the player the right to play nine games for a game prize of $25.00 each game, and one jackpot game in which the prize varied from $500.00 to as much as $3,000.00. In the jackpot game, a bingo was limited to a predetermined number of calls, and if no bingo had been obtained by that time, the game continued until bingo occurred for a "Consolation" prize of $50.00. Generally, on each night in which the jackpot was not reached, an additional amount was added to the successive night's jackpot amount. On some occasions, however, an additional amount was added to the prize of each of the first nine games or to both the jackpot and the prizes for the first nine games. Although the amount of the prizes and jackpots varied, the first series at all times consisted of a total of ten games. SECOND SERIES: Bingo cards were usually sold for $1.00 per card and gave the players the right to play five games. *153 Originally the first four games had a game prize of $10.00 and the fifth game was a jackpot game for $100.00. If no bingo occurred within the specified number of calls, a $20.00 consolation prize was awarded. Later, the first four games had a game prize of $12.50 with a fifth game for a $50.00 guaranteed prize. Still later, the first four games had a game prize of $15.00 per game, and the fifth game was a jackpot game for a $200.00 prize with a consolation prize of $25.00 if no bingo occurred within a specified number of calls. Although the amounts of the prizes and jackpots varied, the second series at all times consisted of a total of five games. THIRD SERIES: The cost of each card for the third series was $1.00 which originally gave the player the right to play four games with a game prize of $12.50 each and one game with a prize of $50.00. This was later changed to two games with a game prize of $25.00 each and one game with a game prize of $50.00. Although the number of games in the third series varied from 3 to 5 games, all prizes would total $100.00. FINAL GAME: I1F SUFFICIENT PLAYERS REMAINED PRESENT AT THE COMPLETION OF THE THIRD SERIES, A FINAL GAME WAS PLAYED. The cost *154 of the card was fifty cents and the game prize was $25.00. These procedures relating to the conduct of the bingo games existed for the period of January 1, 1960, through December 31, 1963, and continued the same from that date until February 1967. 758 Two cash funds were maintained to conduct the bingo operation. One was a $200 cash drawer into which all cash receipts from the sale of bingo cards were paid. All small jackpots or prizes were paid out of this cash drawer. Prior to each series, bundles of cash were counted out of the cash drawer and placed in a number of piles of amounts corresponding to the number of games and cash prizes for small jackpots in each game series. For example, in the first series, nine stacks of $25 were counted out and lined up on the counter. Also paid out of the cash drawer were any expenses which might arise during the night, such as those for coffee. As amounts were paid out, vouchers or receipts were placed in the cash drawer to verify the expenses. The second cash fund maintained was that used to finance the large jackpot payouts. This fund was the responsibility of W.C. Sanderford who kept the cash fund available nightly in case a large *155 jackpot was won. Each night, before the large jackpot game was played, it was announced, if no win occurred, how much money would be added to the subsequent night's jackpot. This large jackpot fund was maintained and replenished from the nightly receipts of the bingo operation. Later, a bank account was opened and the large jackpots were paid by check from the bank account. At the end of business each night, the cash receipts and expenses were counted by the three partners and the daily report was prepared. For the period from January 1, 1960, through October 1, 1961, the daily reports were prepared as follows: The amount of cash in the cash drawer was counted and from the total was subtracted the $200 which constituted the fund before beginning the night's operation. The receipts or vouchers for expenses paid during the night were then counted and added to the cash balance. This sum represented the night's gross receipts less jackpots or prizes paid out. This amount was then entered on the daily report in the appropriate column entitled "Win" or "Loss." Each partner checked the other partner's accuracy. At the end of the month all expenses were totaled and entered on the daily *156 reports. The daily reports, expense vouchers, and payroll records were forwarded monthly to Robert B. Camp, a public accountant, who kept the books for the business. Camp maintained a double entry accounting system for the business, consisting of a cash journal, a general journal, and ledger accounts. Camp also prepared income tax returns and various other tax returns for the business. For the period from October 2, 1961, through July 16, 1963, the daily reports were prepared as follows: The $200 cash drawer fund contained the same receipts and disbursements and was accounted for in the same manner. Each daily report sheet represented one night's operation rather than a month's operation, as in the prior period. The expenses for each night were itemized on each night's daily report. New figures were entered on the daily report as "cash on hand opening" and "cash on hand closing." To the original opening cash sum was added the net profit after jackpots and expenses for each night. To determine the net profit for a certain period, it was only necessary to subtract the cash on hand opening balances for the beginning and ending dates of the period. During the period from January 1, 1960, through *157 July 16, 1963, no record was kept as to whom the small and large jackpots were paid. All jackpots or prizes were paid in cash. The cash fund maintained to pay the large jackpots was the responsibility of W.C. Sanderford. He also held all cash profits until a distribution was made to the partners. Viator and Gillich relied upon the daily reports to determine the amount of profits available for distribution from the funds held by Sanderford. In July 1963, the partners were contacted by a revenue agent of the Internal Revenue Service. The revenue agent examined the books of the Golden Nugget and questioned Sanderford, Gillich and Viator about the operation of the business. He also visited Camp, the accountant for the business, and questioned him concerning the operation and conduct of the business. He did not visit the business premises while the bingo games were in operation. The partners furnished the revenue agent with cancelled checks and invoices to substantiate all expense items claimed on the tax returns. When the agent requested the duplicate tickets reflecting the bingo cards sold, he was informed that they had been destroyed after the net amounts were recorded on the daily *158 report sheets. In the absence of underlying, basic data for verifying the 759 net amounts shown on the daily report sheets, the agent considered the use of the bank deposits method of determining business income. However, since bank accounts were not being used for the regular deposit of receipts and were used only to cover checks written for expenses, the revenue agent abandoned that method of reconstruction. He also attempted to obtain duplicate ticket purchases information as a method for determining the gross receipts from the bingo operation. But such tickets were not used all the time. Occasionally slips of paper were substituted for the duplicate tickets and from one to eight bingo cards were recorded on each ticket. This combination of factors caused the agent to consider the "ticket purchases" approach unsatisfactory. He also considered but abandoned a net worth approach. The revenue agent advised the partners that they should pay all jackpots and prizes by check and that Treasury Form 1099 should be filed for the recipient of each jackpot over $600. For the period July 17, 1963, through December 31, 1963, the daily reports were prepared as follows: The partners opened *159 a bank account and began paying all large jackpots from it. When anyone won a large jackpot their name, address and social security number were entered both on the daily report and on the checks. It was impractical to pay the small jackpots by check so the partners entered on the daily report sheet the number of small jackpots played and the amount of all small jackpots paid out. A gross receipts figure, before all jackpots and expenses, was then determined and entered nightly on the daily report. In his report dated August 11, 1965, the revenue agent disallowed all net losses claimed for the period from January 1, 1960, through July 16, 1963. For the period from July 17, 1963, through December 31, 1963, he disallowed all small jackpots and prizes shown on the daily reports except what he estimated to be a reasonable amount. These disallowances are reflected in the notices of deficiencies dated April 4, 1967, along with the additions to tax under sections 6651(a) and 6653(a). The net losses disallowed by respondent were $33,724 in 1960, $38,449 in 1961, $54,147 in 1962 and $32,439 in 1963. In addition, respondent disallowed small jackpot expense of $30,011 out of $72,711 claimed *160 for the period from July 17, 1963, through December 31, 1963. *
Ultimate Findings The total "net losses" sustained each year in the Golden Nugget bingo operation were as follows: Year
Amount
1960
$26,979.20
1961
30,759.20
1962
43,317.60
1963
25,951.20
The total small jackpot expense for the period from July 17, 1963, through December 31, 1963, was $58,168.80. * Opinion 1. Claimed "Net Losses." Petitioners contend that the records kept and the method of accounting used by them in the Golden Nugget bingo operation for the years 1960 through 1963 clearly reflected income as required by section 446 and the regulations promulgated thereunder, [3] and that the method used by respondent in determining their taxable income was arbitrary and unreasonable. Respondent, on the other hand, maintains that his method for determining petitioners' income was reasonable under these circumstances because the method of accounting used by petitioners did not "clearly reflect income." *161 In our opinion the records kept by petitioners did not "clearly reflect income" within the meaning of section 446(b). The amounts recorded on the "daily report" sheets as "net gains" or "net losses" cannot be verified since the basic data supporting such entries are now unavailable. It was only after considering and exploring other possible methods of reconstructing income that respondent determined the income from the Golden Nugget bingo operation by accepting the amounts recorded on petitioners' records as daily "net gains" and disallowing all the amounts shown as daily "net losses." We cannot say that the method used by respondent was highhanded, irrational or senseless and therefore be characterized as arbitrary and unreasonable. It seems to us that it was perhaps the only method available to respondent in these particular 760 circumstances. It is significant that this same method of determining income has been sanctioned previously by the courts in somewhat analogous situations. Cf. Plisco v. United States, 306 F. 2d 784 (C.A.D.C., 1962), and Stein v. Commissioner, 322 F. 2d 78 (C.A. 5, 1963), affirming a Memorandum Opinion of this Court. However, *162 taking into consideration the obvious fact established by this record that the petitioners could not have carried on such an extensive bingo operation without incurring substantial "net losses," we are unable to agree with respondent that no allowance whatsoever should be made for "net losses." In view of the credible and comprehensive testimony of each partner, Sanderford, Viator, Gillich and their accountants, as well as an analysis and reconstruction of income and "net losses" based upon percentages developed from business operations during the period from July 17, 1963, to February 1967 and a net worth analysis of Viator, we believe the principle of Cohan v. Commissioner, 39 F. 2d 540, 543-544 (C.A. 2, 1930), can be appropriately applied herein. Therefore, on the evidence contained in this record, we have conluded that the Golden Nugget sustained substantial "net losses" in its bingo operation. Our conclusions as to the amounts allowable are set out in our ultimate findings in accordance with the Cohan approximation rule. See and compare Herman Drews, 25 T.C. 1354 (1956), and Jack Showell, 23 T.C. 495 (1954), reversed on other grounds 238 F. 2d 148 *163 (C.A. 9, 1956), on remand T.C. Memo. 1957-22 (1957), reversed on other grounds 254 F. 2d 461 (C.A. 9, 1958), on second remand T.C. Memo 1960-7 (1960), affd. 286 F. 2d 245 (C.A. 9, 1961). Respondent vigorously argues that the petitioners' records do not substantiate the claimed "net losses" because they are merely summaries of basic data destroyed long ago and, without the support of such data, we lack sufficient evidence upon which to make a Cohan determination. In support of this argument respondent cites Plisco v. United States, supra, and Stein v. Commissioner, supra. In these circumstances we regard respondent's reliance on Plisco and Stein as misplaced. In each of those cases a refusal to apply the Cohan rule was upheld in factual situations which differed from the facts present in this case. In both Plisco and Stein the taxpayers relied primarily on their summarized accounting records in attempting to carry their burden of proof. Here, by contrast, petitioners provided corroborative evidence. First, they showed that the "daily report" sheets, upon which the returns were based, were in fact used by *164 the three partners in arriving at a division of profits. See H.T. Rainwater, 23 T.C. 450, 457 (1954). Second, they showed that the accounting system they used had the sanction of a qualified public accountant. Third, they demonstrated that substantial "net losses" were sustained by reconstructing income and losses through percentages developed from business operations in future years. Cf. Melvin E. Tunningley, 22 T.C. 1108, 1117 (1954); National Adjusting Association, 32 B.T.A. 314 (1935); and Webb v. Commissioner, 394 F. 2d 366 (C.A. 5, 1968). Fourth, a net worth analysis was submitted on Joe J. Viator, Jr., one of the partners, covering the years in issue. We also note that in both Plsco and Stein the reliability of the taxpayers' testimony was questionable. Here, by contrast, each partner impressed us with his candor and veracity in such a manner as to lend credence to the substantial authenticity of the daily reports. Moreover, to accept respondent's position would require us to read into both Plisco and Stein something which is simply not there, i. e., a prohibition against the exercise of our judgment in such cases in the *165 light of the evidence adduced at the trial. In Plisco the Court of Appeals carefully stated at page 787: Here there are no reliable figures from which to calculate or extrapolate a reasonable estimate of appellants' losses and expenses. Hence we think Cohan is inapposite. And in Stein the Court of Appeals for the Fifth Circuit commented on pages 82-83: Their trustworthiness and verity can rise no higher than the credibility of Stein's testimony to the effect that they truly state his net losses. It was for the Tax Court to determine the credibility that was to be afforded the testimony of Stein and the verity that was to be afforded his records. * * * In the instant case there is no finding that gambling losses greater than those allowed by the Commissioner were 761 incurred by Stein. On the contrary there is the express finding of the Tax Court to the effect that Stein did not suffer gambling losses during the years in question in amounts greater than those allowed by the Commissioner. In view of that finding of fact, there are no gambling losses to estimate. While we agree generally with the statements made in Plisco and Stein that taxpayers should not be permitted *166 to maintain inadequate books and records and profit from their inexactitudes, these cases do not create an absolute rule of law converting a basically factual question into a mandatory prohibition against the use of the Cohan rule. Suffice it to say that whatever possible defects the daily reports herein might contain, we are not inclined to use them to deny completely the "net losses" claimed by petitioners. 2. Additions to Tax. Under these circumstances we conclude that the petitioners were not negligent and did not intentionally disregard the rules and regulations of the Commissioner. The three partners had only a high school education and were unfamiliar and inexperienced in bookkeeping or accounting. In an attempt to maintain adequate books and records in the conduct of their business, the partners engaged the services of a qualified public accountant and followed his suggestions and recommendations. Cf. Rhett W. Woody, 19 T.C. 350 (1952); and R. E. Nelson, 19 T.C. 575 (1952). In addition, when the revenue agent examined the books and records of the Golden Nugget operation in 1963 and made suggestions to the partners with respect to methods for improving *167 their record keeping, the partners made efforts to comply with his suggestions. Consequently, we hold that petitioners are not liable for the additions to tax under section 6653(a). To reflect conceded adjustments and the conclusions reached herein, Decisions will be entered under Rule 50. Footnotes
1. Consolidated herewith are the following cases: W.C. Sanderford and Alma G. Sanderford, Docket No. 2860-67; Joe J. Viator, Jr., and Virginia Viator, Docket No. 2922-67; and Mike Gillich, Jr., and Marlene Gillich, Docket No. 3002-67.↩
2. All statutory references herein are to the Internal Revenue Code of 1954 unless otherwise indicated.↩
*. By Official Tax Court Order, dated 11-6-69 and signed by Judge Dawson↩, the sentences above marked with an asterisk were added. - CCH.
3. Section 1.446-1(a)(2), Income Tax Regs., provided: (2) It is recognized that no uniform method of accounting can be prescribed for all taxpayers. Each taxpayer shall adopt such forms and systems as are, in his judgment, best suited to his needs. However, no method of accounting is acceptable unless, in the opinion of the Commissioner, it clearly reflects income. A method of accounting which reflects the consistent application of generally accepted accounting principles in a particular trade or business in accordance with accepted conditions or practices in that trade or business will ordinarily be regarded as clearly reflecting income, provided all items of gross income and expense are treated consistently from year to year.↩