**ANCHOR COUPLING COMPANY, Inc.,**
**Plaintiff-Appellee,**

v.

**UNITED STATES of America,**
**Defendant-Appellant.**

**No. 17834.**

United States Court of Appeals,
Seventh Circuit.

May 28, 1970.

Rehearing Denied July 31, 1970.

Thomas A. Foran, U. S. Atty., Chicago, Ill., Johnnie M. Walters, Asst. Atty. Gen., Stephen H. Hutzelman, Atty., Tax Division, Meyer Rothwacks, Crombie J. D. Garrett, Attys., Dept. of Justice, Washington, D. C., for appellant.

Harry Thom, Patrick W. O'Brien, Arthur S. Rollin, George V. Bobrinskoy, Jr., Chicago, Ill., Mayer, Friedlich, Spiess, Tierney, Brown & Platt, Chicago, Ill., of counsel, for appellee.

Before SWYGERT, Chief Judge, CUMMINGS, Circuit Judge, and GRANT, District Judge.[1]

SWYGERT, Chief Judge.

This is a suit for refund of $382,353.-12, representing taxes and interest which the Anchor Coupling Company, Inc. paid after the Commissioner of Internal Revenue disallowed a $600,000 deduction on taxpayer's federal income tax return for its fiscal year ending June 30, 1962. The issue is whether the district court correctly ruled that the $600,000 paid by taxpayer in settlement of litigation seeking specific performance of an alleged contract for the sale

---

1. Chief Judge Robert A. Grant is sitting by designation from the United States District Court for the Northern District of Indiana.

of Anchor's assets to the Borg-Warner Corporation was deductible as an ordinary and necessary business expense rather than a nondeductible capital expenditure. We hold that the $600,000 payment was a nondeductible capital expenditure and, therefore, reverse.

Anchor Coupling Company is an Illinois corporation having its principal office in Libertyville, Illinois. The founders of the company were Charles Conroy and Walter Fritsch. In 1956 Conroy and Fritsch owned approximately ninety per cent of Anchor's outstanding stock. Early in that year they entered into negotiations for the sale of Anchor's assets to Borg-Warner. On February 20 Borg-Warner wrote Anchor setting forth a proposed agreement which gave Borg-Warner a sixty-day option to purchase Anchor's assets. On February 29 Anchor replied, stating in substance that its assets could be purchased for $4,025,000, provided suitable assurance was given that Anchor's lower level executive personnel would be retained by Borg-Warner. The letter was characterized by the Illinois Supreme Court as a "counter offer."

Thereafter it became apparent that Borg-Warner intended upon consummation of the sale to reduce the salaries and responsibilities of certain executives and that some of the executives intended to seek employment elsewhere. As a result Conroy, over the opposition of Fritsch, decided to terminate the negotiations and to resist, by litigation if necessary, Borg-Warner's efforts to acquire Anchor's assets.

On November 3, 1956 Borg-Warner filed a complaint in the Circuit Court of Lake County, Illinois against Fritsch, Conroy, and Anchor, alleging that the intercompany correspondence between Anchor and Borg-Warner constituted a contract for the sale of Anchor's assets and seeking specific performance. In May 1957 the Circuit Court dismissed the complaint on the grounds that Borg-Warner failed to allege a completed contract and that the alleged negotiations,

even if they constituted a contract, were unenforceable by reason of the statute of frauds. Borg-Warner filed an amended complaint which was dismissed on similar grounds. On appeal the Illinois Supreme Court reversed, holding that the amended complaint stated a cause of action and remanded the case for trial to determine whether the parties had entered into a binding contract. Borg-Warner Corp. v. Anchor Coupling Co., Inc., 16 Ill.2d 234, 156 N.E.2d 513 (1958).

Trial before the court commenced on May 24, 1961, but was adjourned for the summer after two days of testimony. On July 5, 1961 Fritsch died. His son, John, and William Funck, as executor of the estate, became representatives of the Fritsch interests in Anchor. Thereafter, Anchor contacted Borg-Warner concerning a possible settlement of the litigation. In October 1961 a settlement was reached. In return for relinquishing all claim to Anchor's assets and dismissing its suit, Borg-Warner received $1,000,000. As between the several representatives of the taxpayer, Conroy paid $150,000, the Fritsch estate $250,000, and Anchor $600,000.

Anchor deducted the $600,000 payment as an ordinary and necessary business expense on its federal income tax return for its fiscal year ending June 30, 1962. The Commissioner of Internal Revenue disallowed the deduction on the ground that the payment was a nondeductible capital expenditure. Anchor paid the tax and interest due as a result of the disallowed deduction and filed a claim for refund. The claim was disallowed, and the present suit followed.

The district court found that the pendency of the Borg-Warner litigation, from October 1956 to November 1961, had "an adverse effect upon plaintiff's [Anchor] day-to-day operations." Specifically the court determined that as a result of the litigation Anchor's sales and income "remained stagnant" and its competitive position "deteriorated" during a time of "rapidly increasing demand" when Anchor, because of the suit, "curtailed nec-

essary expenditures." As a result the court concluded that:

> Plaintiff's $600,000 payment to Borg-Warner was made in good faith and was reasonable in amount. The payment was made with a present business purpose to free plaintiff from the constraints imposed upon its business operations by the pendency of the litigation. The $600,000 payment in question bore a direct and proximate relationship to plaintiff's operations and to the production of income from such operations and was made to conserve and protect property held by plaintiff for the production and generation of income.

Accordingly, the court held that the payment to Borg-Warner of $600,000 was an ordinary and necessary business expense and ordered the Government to pay Anchor $382,353.12 plus interest from September 15, 1966. This appeal followed.

The only question in this appeal is whether the $600,000 settlement of the Borg-Warner litigation was an ordinary and necessary business expense deductible from current income under section 162(a) [2] of the Internal Revenue Code of 1954, or a nondeductible capital expenditure under section 263 of the Code.[3] In holding that the settlement payment was an ordinary and necessary business expense, the district court relied primarily upon two factors: (1) the effect of the Borg-Warner claim and litigation on Anchor's operations and the possible consequences of not settling the claim on taxpayer's business; and (2) Anchor's primary motivation in making the settlement was to avoid the consequences noted in (1) and to improve its earnings from current operations. Under the "primary purpose" test applied in previous cases these factors may be relevant

in determining whether or not expenditures are deductible as payments made to protect ownership or to defend title to a capital asset. Rassenfoss v. Commissioner of Internal Revenue, 158 F.2d 764 (7th Cir. 1946); *see generally*, cases collected in 4A, J. Mertens, Law Of Federal Income Taxation §§ 25.24, 25A.16 (1966 ed.). The Government urges that the primary purpose test is no longer the appropriate test in light of the Supreme Court's decisions in United States v. Gilmore, 372 U.S. 39, 83 S.Ct. 623, 9 L.Ed.2d 570 (1963); Woodward v. Commissioner of Internal Revenue, 397 U.S. 572, 90 S.Ct. 1302, 25 L.Ed.2d 577 (April 20, 1970); and United States v. Hilton Hotels Corp., 397 U.S. 580, 90 S.Ct. 1307, 25 L.Ed.2d 585 (April 20, 1970). We agree and hold that the district court erred in considering the possible consequences of the failure to settle on Anchor's current operations and the taxpayer's motives in entering into the settlement.

In *Gilmore* the Supreme Court was asked to determine whether litigation expenses were deductible business expenses or nondeductible personal expenses. The taxpayer and his wife were engaged in a hotly contested divorce proceeding. The taxpayer believed that loss of the divorce proceeding would threaten his controlling stock interest in an auto dealership and, by damaging his reputation, would endanger his ability to renew his General Motors franchise. He, therefore, deducted over $40,000 in legal expenses as an ordinary and necessary business expense. The Commissioner denied the deduction, but the Court of Claims held that eighty per cent of the expenses were deductible as defending community property claims against the taxpayer's stockholdings. The Supreme Court reversed, holding that the Court

---

2. Section 162 of the Internal Revenue Code of 1954 reads in pertinent part:
   (a) *In General.*—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including—
   * * *.

3. Section 263 of the Internal Revenue Code of 1954 in pertinent part:
   (a) *General Rule.*—No deduction shall be allowed for—
   (1) Any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate.

of Claims had applied the wrong test in determining whether the legal expenses of the taxpayer were personal expenses or ordinary and necessary business expenses. The Court stated the proper test as follows: "[T]he origin and character of the claim with respect to which an expense was incurred, rather than its potential consequences upon the fortunes of the taxpayer, is the controlling basic test of whether the expense was 'business' or 'personal' and hence whether it is deductible or not under § 23(a) (2)." [Section 212 of the 1954 Code.] United States v. Gilmore, *supra*, 372 U.S. at 49, 83 S.Ct. at 629.

In the *Woodward* and *Hilton Hotels* cases the Court was asked to determine whether expenses in connection with appraisal litigation were capital expenditures incurred in the acquisition or disposition of a capital asset. In *Woodward* taxpayers controlled a majority of common stock in an Iowa publishing corporation. In 1960 the taxpayers voted their controlling shares in favor of perpetual extension of the corporate charter. Under Iowa law the majority shareholders were required to purchase the stock of shareholders who voted against renewal of the charter. The Eighth Circuit held that these expenses were nondeductible capital expenditures, Woodward v. Commissioner of Internal Revenue, 410 F.2d 313 (1969). The *Hilton Hotels* case concerned litigation expenses incurred pursuant to New York law in connection with the valuation of the shares of persons objecting to the merger of Hilton Hotels Corporation and Hotel Waldorf-Astoria Corporation. This court applied the primary purpose test announced in Rassenfoss v. Commissioner of Internal Revenue, 158 F.2d 764 (7th Cir. 1946), and held that "the proceeding was not necessary to the consummation of the merger nor did it function primarily to permit the acquisition of the objecting holders' shares," and that "the paramount purpose of the appraisal proceeding was to determine the fair value of the dissenting stockholders' shares in Waldorf." Hilton Hotels Corp. v. United States, 410 F.2d 194, 197 (1969). Accordingly, we held post-merger appraisal expenses were deductible as ordinary and necessary business expenses.

The Supreme Court reversed our decision in *Hilton Hotels* and affirmed the Eighth Circuit's decision in *Woodward*, In so doing the Court held that the test to be applied in determining whether costs are incurred in the acquisition of a capital asset is a simple "inquiry whether the origin of the claim litigated is in the process of acquisition itself." Woodward v. Commissioner, *supra*, 90 S.Ct. at 1306. The Court rejected the application of the primary purpose test in this area noting that: "A test based upon the taxpayer's 'purpose' in undertaking or defending a particular piece of litigation would encourage resort to formalisms and artificial distinctions." Woodward v. Commissioner, *supra*, at 1306. As the Court recognized, this approach fully comports with "objective" principles of deductibility established in *Gilmore*.

In *Woodward* in discussing its rejection of the primary purpose test proposed by this court in *Hilton Hotels*, the Court noted briefly the application of that theory to costs of defending title to a taxpayer's property. The primary purpose test has never been directly reviewed by the Supreme Court and has been developed entirely by lower courts. As the Court explained: "This test [the primary purpose test] hardly draws a bright line, and has produced a melange of decisions, which, as the Tax Court has noted, 'it would [sic] idle to suggest * * * can be reconciled.' Hermann F. Ruoff, 30 T.C. 204, 208 (1952)." Woodward v. Commissioner, *supra*, at 1305. However, the Court did not intimate the extent to which the primary purpose test, as applied to costs incurred in protecting ownership, has been rejected by the adoption of an objective standard of deductibility in *Gilmore* and *Woodward*.[4]

4. The Court merely noted: "That uncertain and difficult test may be the best that can be devised to determine the tax treatment of costs incurred in litigation that

We are convinced that the considerations which prompted the Court to announce such a test in these cases also impel us to fashion a similar test for determining whether the settlement payment in this case is a business expense or a capital expenditure.

In so doing we rely particularly on *Gilmore*. Taxpayer argues that *Gilmore* is inapplicable because we are asked here to determine whether a settlement constitutes an ordinary and necessary business expense or a capital outlay and not whether a payment is a deductible business expense or a nondeductible personal expense. We disagree. Although the two questions are admittedly different, substantially the same problems arise in each determination. Thus in both cases the court must determine the tax consequences of monetary outlays made in connection with contesting a claim on the taxpayer's assets. Consideration of the taxpayer's motive and the consequences of his failure to make a payment or to incur an expense create the same problems in both cases. For the deductibility of payments to depend upon such elusive determinations causes tremendous difficulties for the administration of the tax laws. Further, for deductibility to depend upon subjective considerations encourages schemes of tax avoidance and, as the Supreme Court noted in *Gilmore,* can lead to capricious results and a concomitant lack of uniformity in the application of our tax laws. Finally, as the Court noted in *Woodward,* a test based upon taxpayer's purpose in defending or settling litigation would encourage resort to "formalisms and artificial distinctions."

▆ Taxpayer seeks to avoid these conclusions by arguing that here, as in contrast to *Gilmore* and *Woodward,* considerations of motive and the consequences on his business operations are necessary to determine whether the payment is made to protect or defend busi-

ness property of the taxpayer. We see no such distinction. Admittedly, a settlement payment may have significant effect on current business operations, but as much could also be said for the legal expenses in *Gilmore,* or for that matter, the purchase of many capital assets. Accordingly, we hold that the origin and character of the claim with respect to which a settlement is made, rather than its potential consequences on the business operations of a taxpayer is the controlling test of whether a settlement payment constitutes a deductible expense or a nondeductible capital outlay.

▆ When this test is applied to the instant case, it is evident that the Commissioner was correct in denying the deduction claimed by Anchor. The origin and nature of the claim by Borg-Warner, which was liquidated by Anchor's settlement payment, directly concerns Anchor's capital assets. The alleged contract between Anchor and Borg-Warner created a claim on Anchor's assets by virtue of the doctrine of equitable conversion. Therefore, Anchor protected ownership to its assets by removing Borg-Warner's claim through the settlement payment of $600,000.

This analysis is supported by two cases which have held that settlement payments constituted capital expenditures on facts nearly identical to those before us. In United States v. Wheeler, 311 F.2d 60 (5th Cir. 1962), cert. denied, 375 U.S. 818, 84 S.Ct. 54, 11 L.Ed.2d 53 (1963), the taxpayer, owner of a corporation, contracted to sell his stock in the corporation for $1,000,000, but refused to complete the sale because he believed that he had been duped by the purchaser's attorney. The taxpayer subsequently settled a specific performance action brought by the purchaser for approximately $56,000. The Court of Appeals concluded that the facts "leave us in no doubt that the suit * * * was a suit for specific performance and direct-

---

may affect a taxpayer's title to property more or less indirectly, and that this calls for a judgment whether the taxpayer can

fairly be said to be 'defending or perfecting title'." Woodward v. Commissioner, 90 S.Ct. 1306 (April 20, 1970).

ly involved title to the stock in question." United States v. Wheeler, *supra*, at 63. Similarly in Wise v. Commissioner of Internal Revenue, 311 F.2d 743 (2d Cir. 1963), the taxpayer leased land under an agreement which gave the tenant an option to purchase. The tenant exercised the option and sued for specific performance when the taxpayer refused to convey the property. The court held that the $7,000 settlement payment was made by the taxpayer to preserve his title to the property and, therefore, denied his claim that the payment was deductible.

We think these cases demonstrate that payments made in settlement of actions for specific performance should be treated as capital transactions. Taxpayer cites five cases in support of his contention that the settlement payment in this case is deductible as an ordinary and necessary business expense. Rassenfoss v. Commissioner of Internal Revenue, 158 F.2d 764 (7th Cir. 1946); Allied Chemical Corp. v. United States, 305 F.2d 433, 158 Ct.Cl. 267 (1962); Ruoff v. Commissioner of Internal Revenue, 277 F.2d 222 (3d Cir. 1960); Alleghany Corp. v. Commissioner, 28 T.C. 298 (1957); Reakirt v. Commissioner, 29 B. T.A. 1296 (1934). All of these cases employed the primary purpose test and concern transactions significantly different from that involved in the instant case. Under the objective test applied here many of the cases cited involve border line questions and perhaps would be decided differently. We decline to follow those cases to the extent that they are inconsistent with the result reached in this case.

■ The Government offers another argument which we think should be mentioned briefly to further buttress the result we have reached. It argues that the settlement and release received by Anchor in return for its settlement payment created enforceable rights in Anchor which constituted the acquisition of a capital asset. We agree that the transaction can also be viewed in this manner. Thus, if Anchor had completed the proposed sale of its assets by accepting $4,-

025,000 and then repurchased its assets for $4,625,000, it can hardly be doubted that the $600,000 premium would be included in the new book value of Anchor's assets. The settlement in this case accomplished an identical purpose and should be accompanied by identical tax treatment. *See* American Dispenser Co., Inc. v. Commissioner of Internal Revenue, 396 F.2d 137 (2d Cir. 1968).

The judgment is reversed.