**LARK SALES COMPANY, Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Appellee.**

No. 17981.

United States Court of Appeals, Seventh Circuit.

Dec. 9, 1970.

Rehearing Denied Jan. 21, 1971.

John F. Kelly, Chicago, Ill., Duane P. Benson, Moline, Ill., for appellant.

Johnnie M. Walters, Asst. Atty. Gen., Gordon S. Gilman, Atty., Tax Division, U. S. Department of Justice, Washington, D. C., Lee A. Jackson, William A. Friedlander, Attys., Department of Justice, Washington, D. C., for appellee.

Before HASTINGS, Senior Circuit Judge, and CUMMINGS and PELL, Circuit Judges.

PELL, Circuit Judge.

Taxpayer, Lark Sales Company, an Illinois corporation, appeals from the decision of the Tax Court which sustained, in part, the determination of deficiencies against Lark by the Commissioner of Internal Revenue in the amounts of $109,791.04, $93,635.42, $69,875.71 and $52,118.70 for the respective years of 1955, 1956, 1957 and 1958.[1] The Tax Court redetermined the deficiencies in the amounts of $106,425.24, $57,410.80, $41,355.22 and $10,771.78. The decision of the Tax Court is reported at 27 T.C. M. 1224.

The issues on this appeal are almost purely factual. The record before us consists of 1148 pages of oral testimony, a voluminous number of exhibits, 2280 pages of briefs and appendices and a Tax Court opinion of 211 pages. The factual situation resulting in the determination of the deficiencies is a conglomerate mass of confusing and often inconsistent contractual arrangements between various individuals and corporations. Inasmuch as these instruments are fully referred to in the reported decision of the Tax Court, little purpose would be served by setting them forth in this decision. It seems unlikely that the precise factual morass involved in this

---

1. In the Tax Court this case was consolidated with several others against certain other taxpayers, referred to herein as the Medds. When taxpayer, Lark Sales Company, filed its appeal No. 17,981, the Commissioner filed protective cross-appeals Nos. 17,982 through 17,986 against the Medds. On its appeal, Lark has waived the issue which necessitated the protective cross-appeals by the Commissioner. Accordingly, on the motion of the Medds, and by stipulation of the parties herein, the decision of the Tax Court appealed from in Nos. 17,982 through 17,986 has been affirmed by a *per curiam* order of this court dated September 29, 1970.

case will again present itself. Accordingly, we are in this decision confining ourselves simply to the basic facts necessary for the purpose of the decision.

One Harry Oltz patented a soft ice cream freezer, which became the basis of the Dairy Queen ice cream business eventually established through the efforts of one H. A. McCullough, Oltz and his family primarily operated through Ar-Tik Systems, Inc., a corporation. McCullough, his family and his accountant, L. S. Murchie, operated through various corporations as well as individually. Oltz's patent expired in 1954 and apparently much of the machination arose from an effort to preserve royalty rights subsequent to the patent expiration.

### 2¢ EAST ROYALTY INCOME

Royalty payments under the so-called Eastern Agreement were to be collected and of this 2¢, known as "2¢ East," was to be paid by Ar-Tik to McCulloughs Dairy Queen.

The first issue presented for our review concerns the ownership of, and thus the tax liability for, the 2¢ East income for the years 1956, 1957 and 1958. Both the Commissioner and the Tax Court found that Lark was the owner of the 2¢ East royalty right during these years.

In 1947 certain of the McCulloughs purported to assign 2¢ East to Ilco-Mac Venture which in turn, by a bill of sale dated December 30, 1950, transferred its rights to the Micro Manufacturing Company. Both of these entities were dominated by Murchie.

By an agreement dated April 2, 1954 the McCulloughs, in apparent disregard of the earlier assignment, transferred the ownership of 2¢ East to Lark. This transfer purported to be complete and absolute on its face.

The April 2, 1954 agreement was attached as an exhibit to yet another agreement, the so-called "Lark/Ar-Tik Agreement" dated December 31, 1954 but executed February 25, 1955. So far as here relevant, this agreement gave Lark the right to collect money due Ar-Tik under the Eastern Agreement and provided that Lark should remit such collections, after certain deductions, to Ar-Tik on a monthly basis.

■ Lark contends that the Tax Court erred in three respects in finding that it was the owner of 2¢ East.

Lark's first contention was that Micro was the owner of this royalty by virtue of the 1950 bill of sale. While we do not agree with the Tax Court's finding that it could not identify the 2¢ royalty referred to in the 1950 bill of sale with 2¢ East, we do not find persuasive evidence of Micro's ownership. Micro paid no consideration for the alleged transfer to it of 2¢ East. All the collections of 2¢ East made by Ar-Tik prior to the Lark/Ar-Tik Agreement were remitted directly to the McCulloughs and never to Ilco-Mac or Micro. In 1953, the McCulloughs, not Micro, signed a supplement to the Eastern Agreement. During the negotiations leading to the Lark/Ar-Tik Agreement, Murchie, who was conducting the negotiations and who owned and controlled Micro, never gave any indication that Micro, rather than the McCulloughs, was the owner of 2¢ East.

Lark next contends that the negotiations leading to the execution of the Lark/Ar-Tik Agreement show that 2¢ East was transferred to Lark only to provide Ar-Tik with security under that agreement. While it is true that an absolute transfer on the face of a document may under some circumstances be shown actually to be a security device, it does not necessarily follow that because Ar-Tik, for purposes of its own security, wished Lark to have "some substance" that Lark acquired only a security interest in 2¢ East.

It would seem more consistent with Ar-Tik's purposes that Lark be given absolute ownership of the asset rather than a mere security interest subject to the claims of the true owner. The record supports this as being the intent

of the parties. At the time the negotiations were taking place between Lark and Ar-Tik, Ar-Tik's attorney prepared a memorandum letter to his co-counsel and his principal noting that "the substance in Lark is now to be created by the assignment of the 2¢ due on the Eastern Contract to Lark which would become Lark's property. * * *" In the Tax Court, he testified that the agreement reached was for the vesting of the ownership of 2¢ East in Lark and that this was "vital" to Ar-Tik.

Finally, Lark contends that the conduct of the various parties supports its interpretation of the above agreements. It is true that in years prior to the Lark/Ar-Tik Agreement, amounts remitted to the McCulloughs as 2¢ East income were reported as income on the returns of Ilco-Mac and Micro. However, the record also shows that the claimed income was never in fact paid over to Micro. Further, despite Lark's assertion that it was merely an agent to collect for both Micro and Ar-Tik, collections of 2¢ East were credited on its books to "Lark Accommodation Credits" and were retained by Lark as income. In contrast, Lark's collections of royalties due Ar-Tik were credited to "Ar-Tik Accommodation Credits" and were eventually remitted to Ar-Tik in one form or another. Thus, Lark's own conduct as revealed by the record indicates that it claimed greater rights to 2¢ East collections than it did to other royalty collections.

The question of the ownership of 2¢ East under the array of agreements and assignments which we have attempted to outline briefly is a purely factual one. Our review of the decision of the Tax Court is limited accordingly. It is well settled that factual findings of the Tax Court must stand unless shown to be clearly erroneous within the meaning of Rule 52(a), Fed.R.Civ.Proc. Commissioner of Internal Revenue v. Duberstein, 363 U.S. 278, 291, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960); Tripp v. Commissioner of Internal Revenue, 337 F.2d 432, 434 (7th Cir. 1964). This standard is also applicable to factual inferences drawn from undisputed basic facts. Duberstein, supra. Where the evidence would support either of two permissible conclusions, the choice of the Tax Court between them is not clearly erroneous. United States v. Yellow Cab Co., 338 U.S. 338, 342, 70 S.Ct. 177, 94 L.Ed. 150 (1949). A finding of fact is clearly erroneous only when, although there is evidence to support it, the reviewing court on the basis of all the evidence is left with the definite and firm conviction that a mistake has been committed. United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948).

We have carefully reviewed the entire record pertaining to the ownership of 2¢ East and have attempted to summarize the most relevant aspects of it. The facts and circumstances revealed therein are at least as consistent with the findings of the Tax Court as with Lark's contrary position. In such a case, the decision of the Tax Court to draw one, rather than the other, permissible inference cannot be said to be clearly erroneous. Yellow Cab, supra, 338 U.S. at 342, 70 S.Ct. 177. This is particularly so here for "findings as to the design, motive and intent with which men act depend peculiarly upon the credit given to witnesses by those who see and hear them." Id. at 341, 70 S.Ct. at 179. Thus the Tax Court did not err in concluding that Micro did not own 2¢ East during 1956, 1957 and 1958, that Lark did own it during those years and that its ownership was complete and not confined to a security interest.

## EXPENSE REIMBURSEMENTS FROM AR-TIK

Under the Lark/Ar-Tik Agreement, Lark had the right to reimbursement from Ar-Tik for certain expenses. Paragraph 6 of the Agreement provided:

"6. Lark shall render to Ar-Tik a report of its costs of operations from time to time, which report shall show the areas occasioning such expenses and the amounts thereof, and Ar-Tik,

within ten (10) days of receipt of such report, shall make payment to Lark of Ar-Tik's share of such expenses in the proportions to which Ar-Tik and Lark are sharing revenue from such area as set forth in Paragraph 5 above."

For the years 1955 through 1958, Lark kept its books and filed its federal tax returns on an accrual basis. During those four years it recorded on its books and reported in its returns the respective amounts of $93,053.34, $53,568.20,[2] $27,140.73 and $12,279.19 referred to as "Expense Allocations to Ar-Tik" and representing Lark's allocation to Ar-Tik of its alleged share of the costs of Lark's operations.

Lark subsequently sought to amend its returns for the years in question by deleting the above amounts from its income, contending that its right to receive such amounts was in dispute between it and Ar-Tik during the respective years and that such amounts were too contingent to be accrued as income until a settlement was reached with Ar-Tik in 1959. The Commissioner determined, and the Tax Court held, that the amounts were properly included in the returns as originally filed.

The following facts are discernible from the record. No part of the amounts accrued and claimed by Lark had been paid by Ar-Tik as of December 31, 1958. With one exception, Lark had not submitted to Ar-Tik the reports required of it by paragraph 6 of the agreement. On March 15, 1956, shortly over a year after Lark began collecting royalties for Ar-Tik under the Lark/Ar-Tik Agreement, Ar-Tik filed suit against Lark and Murchie in the Circuit Court of Rock Island County, Illinois, seeking an accounting for past collections, an injunction against future collections and damages for breach of contract. In April 1956, a temporary in-junction was granted which was modified in June of the same year at Ar-Tik's request to permit Lark to make certain collections from operators who had signed territorial agreements with it. Lark was to be permitted to retain out of the amounts collected by it for Ar-Tik "authorized commitments for advertising and store services."

The only report of expenses pursuant to paragraph 6 which Lark submitted was on July 31, 1956 while the state court litigation was pending. Ar-Tik rejected this on several grounds. Included was the fact that the period prior to April 9, 1956 was before the state court and, as to the subsequent period, Ar-Tik was making its own collections and therefore was not responsible to Lark for any costs of collection. A partial accounting submitted to the state court by Lark was also objected to by Ar-Tik.

In October 1959, before any further accounting had been submitted, the parties settled the litigation. As part of the settlement agreement, Ar-Tik agreed to pay to Lark:

| | | |
|---|---|---|
| "(a) Ar-Tik's share of expenses for the year 1955 | | $92,478.34 |
| "(b) Ar-Tik's share of expenses for the year 1956 | | 2,175.46 |
| "Total expenses | | $94,653.80" |

Lark included this amount of $94,653.80 on its federal tax return for 1959.

Contemporaneously with the settlement agreement, the parties agreed to terminate the Lark/Ar-Tik Agreement in all respects and stated that each had fully performed all agreements and that each was released and discharged from all liabilities under previous agreements.

 The parties agree that the general rule of law applicable here is that for purposes of accruing income items, "it is the *right* to receive and not the actual receipt that determines the inclusion," Spring City Foundry Co. v. Com-

---

2. The record contains an unexplained discrepancy with reference to this figure. On its books for 1956 Lark accrued the amount $52,992.30 as expenses allocable to Ar-Tik. However, the figure $53,568.-

20 found by the Tax Court for 1956 seems correct so far as Lark's tax returns are concerned. We shall, therefore, rely on this latter figure.

missioner of Internal Revenue, 292 U.S. 182, 184, 54 S.Ct. 644, 645, 78 L.Ed. 1200 (1934), so that income accrues when all the events have occurred which fix the taxpayer's right to the income and make possible the calculation of the amount. Continental Tie & Lumber Co. v. United States, 286 U.S. 290, 295–299, 52 S.Ct. 529, 76 L.Ed. 1111 (1932); United States v. Anderson, 269 U.S. 422, 441, 46 S.Ct. 131, 70 L.Ed. 347 (1926).

■ We are not impressed with Lark's first contention that it had no right to the reimbursement because it had failed to comply with the conditions precedent of submitting reports to Ar-Tik. We agree with the Tax Court's finding that the required reports "were primarily for the convenience of Ar-Tik * * * and were not a condition precedent to Lark's rights."

More persuasive, however, is Lark's second contention that its right to the reimbursements could not be said to be fixed at the very time Ar-Tik was denying liability for them in the state court litigation. Numerous decisions are supportive of the doctrine that income does not accrue while the amount or the taxpayer's right to receive it is uncertain because of being the subject of *bona fide* litigation.[3]

The Tax Court apparently, however, chose to disregard the fact that there was state court litigation and that Ar-Tik had protested Lark's method of computing and assessing the expense allocations.

The Tax Court's rationale was that the 1959 settlement shows that Ar-Tik paid substantially the amount originally accrued by Lark for 1955 and that as to amounts accrued for the remaining years, "we can only conclude that they were paid by Ar-Tik" in view of the general recitals of performance and release in the agreement terminating the Lark/Ar-Tik Agreement.

We find the Tax Court's assumption unpersuasive. Such an assumption conflicts not only with the common understanding of the purpose of such "boilerplate" protective clauses in settlement agreements but also with the facts present in this record.

None of the accrued expense allocations had been paid by Ar-Tik as of December 31, 1958. Nine months later, the settlement agreement showed full payment for amounts due to April, 1956. It seems rather incredible to assume that Ar-Tik, during this nine month period, paid the full amount due for the post-April, 1956 period without the transaction being set forth in detail in the settlement document. Rather, it seems clear that the amount actually paid pursuant to the agreement represented a compromise settlement of the disputed amounts for all of the years prior to the effective date of the settlement, with there being an artificial allocation by the parties to 1955 and part of 1956.

On this appeal, the Commissioner contends, in further support of the Tax Court's decision, that Lark was in fact paid for the expense allocations by being

3. See, e. g., United States v. Safety Car Heating & Lighting Co., 297 U.S. 88, 97–98, 56 S.Ct. 353, 80 L.Ed. 500 (1936); North American Oil Consolidated v. Burnet, 286 U.S. 417, 423, 52 S.Ct. 613, 76 L.Ed. 1197 (1932); Irwin v. Commissioner of Internal Revenue, 238 F.2d 874, 877 (3d Cir. 1956); Commissioner of Internal Revenue v. Henry Hess Co., 210 F.2d 553, 555 (9th Cir. 1954); Jamaica Water Supply Co. v. Commissioner of Internal Revenue, 125 F.2d 512 (2d Cir.) cert. den. 316 U.S. 698, 62 S.Ct. 1295, 86 L.Ed. 1767 (1942); Swastika Oil & Gas Co. v. Commissioner of Internal Revenue, 123 F.2d 382, 384 (6th Cir. 1941) cert. den. 317 U.S. 639, 63 S.Ct. 30, 87 L.Ed. 515 (1942); and Triplex Safety Glass Co. of North America v. Latchum, 44 F. Supp. 436, 438 aff'd per curiam 131 F.2d 1023 (3d Cir. 1942). See also United State v. Consolidated Edison Co. of New York, Inc., 366 U.S. 380, 81 S.Ct. 1326, 6 L.Ed.2d 356 (1961); Security Flour Mills Co. v. Commissioner of Internal Revenue, 321 U.S. 281, 64 S.Ct. 596, 88 L.Ed. 725 (1944); Dixie Pine Products Co. v. Commissioner of Internal Revenue, 320 U.S. 516, 519, 64 S.Ct. 364, 88 L.Ed. 270 (1944); and Lucas v. American Code Co., Inc., 280 U.S. 445, 50 S.Ct. 202, 74 L.Ed. 538 (1930).

permitted, under the modified state court injunction, to retain "authorized commitments for advertising and store services" before remitting collections to Ar-Tik.

Our examination of the record reveals that the amounts retained by Lark for "advertising and store services" were completely different from the amounts accrued as expense allocations and pertained to wholly separate affairs. They were assessed against Ar-Tik for payment to a separate Dairy Queen corporation created to centralize advertising and sales materials and for payment to certain operators entitled to financial assistance from Ar-Tik and other national interests. The expense allocations covered the costs of Lark's operations.

■ We conclude that the settlement for approximately half the amount accrued after a long period of litigation demonstrates that there was a *bona fide* challenge to Lark's right to the amount accrued and to its method of computing the same. Under these circumstances it cannot be said that Lark's right to the amount claimed was so fixed and certain as to be accruable as income in any year prior to the settlement in 1959.

The Commissioner on appeal further argues that even if there was an adverse ruling as to the period from 1956 through 1958, the amount accrued for 1955 was properly included income for that year for the reason that the state court litigation was not commenced until March, 1956. The Commissioner contends that as a matter of law "a subsequently initiated challenge * * * could not retroactively abrogate the accrual during 1955."

It is clear from the record, however, that Ar-Tik lodged its protest to Lark's accruals for the first time in a letter dated December 29, 1955 and reiterated its objections again on February 8, 1956. Thus, the first protest came before Lark closed its books for 1955 and both protests came before Lark filed its income tax return for that year. There is no real indication that at any time when the matter was consciously considered, there was other than a definite, serious and *bona fide* dispute as to the amount and liability involved. We therefore conclude and find that the Tax Court erred in refusing to permit Lark to eliminate from its returns for 1955 through 1958 the amounts reported as accrued income from the so-called Ar-Tik Expense Allocations.

### MURCHIE ACCOUNTING FEES

■ All of the Lark's accounting matters were handled by L. S. Murchie & Co., an accounting firm owned by Murchie as sole proprietor. On its returns for 1956, 1957 and 1958, Lark claimed, respectively, $59,913.50, $29,408.25 and $13,570.50 as deductible ordinary and necessary business expenses incurred for accounting services rendered by L. S. Murchie & Co. The foregoing amounts remained unpaid by Lark during the years of accrual and thereafter until at least March 15, 1959.

In the Tax Court, the Commissioner contended that the claimed deductions should be disallowed on the grounds that they were not ordinary and necessary business expenses and that they were barred by Section 267 of the 1954 Internal Revenue Code, 26 U.S.C. § 267. The Tax Court disallowed the deductions on the latter ground without reaching the former.

Section 267(a) (2) provides, in substance and as relevant here, that no deduction shall be allowed for an expense incurred by an accrual basis taxpayer, such as Lark, if the person to whom payment is due is a "related person" who reports his income on the cash basis, as did Murchie, and if payment of the expense is not made during the taxable year of the taxpayer or within 2½ months thereafter.

Lark concedes the applicability of Section 267 to bar the claimed deductions if Murchie and Lark are "related persons" within its definitions, but denies that they are. The Commissioner asserts that more than 50% of Lark's outstand-

ing stock was owned, directly or indirectly, by Murchie during the relevant periods and that Murchie and Lark are thus related persons within the meaning of Section 267(b) (2).

On January 1, 1956, Murchie was the sole owner of all the outstanding stock of Lark, consisting of 64 shares, and of McCulloughs Dairy Queen, Inc., consisting of 100 shares.

On January 1, 1956, Murchie purportedly sold all 64 Lark shares to McCulloughs Dairy Queen, Inc., for $14,-428.93. On March 31, 1956, he purportedly sold all 100 of his shares in McCulloughs Dairy Queen, Inc., 48 shares to H. A. McCullough, 48 to H. F. McCullough, and 4 to M. P. Murchie, his wife. On the basis of these transactions, Lark contends that Murchie did not own any of its stock, directly or indirectly, during the relevant periods.

Again, however, we are confronted with inconsistencies. While the transactions are reflected on the tax returns of Lark for the calendar year 1956 and of McCulloughs Dairy Queen, Inc., for the fiscal year ending March 31, 1957, the returns of the latter corporation for the year ending March 31, 1956 and its balance sheet for the same period do not reflect the purported purchase by it of the Lark stock. The March 31, 1956 return shows Murchie as the owner of 100% of the stock although his endorsement of the Lark shares is dated January 1, 1956. As to both transactions there is some evidence of an attempt to back-date. The journal entry on the McCulloughs Dairy Queen, Inc., books recording the purported purchase of the Lark shares is dated "4–1–56" but is sandwiched between two entries both dated "3–1–57." The endorsement on the back of Murchie's McCulloughs Dairy Queen, Inc., certificate purportedly transferring it to the McCulloughs and Murchie's wife shows that the original date of "3–31–1957" was altered to read "3–31–1956."

Also of significance is the fact that none of these transfer transactions was evidenced by any contractual document. Murchie was not paid anything at the time of the transfers nor is there any indication that a promissory note was given or other contractual arrangements made for payment of interest on a deferred indebtedness nor was any interest in fact paid. No date was fixed for payments for the stock so transferred and no payment was made during the years here in question nor for some years thereafter, if ever.

Further, it appears that H. F. McCullough had no knowledge of the alleged transfer to him until October, 1958. Also in 1958, apparently following the death of M. P. Murchie, Murchie transferred four shares of McCulloughs Dairy Queen, Inc., to one of his employees, again without consideration.

Not only is there support in the record for the belief that Murchie exercised control over the affairs of McCulloughs Dairy Queen, Inc., prior to the purported transfer of its stock in 1956, but the indication is that this control continued thereafter. Throughout 1956, 1957 and 1958, both the president and secretary and all of the directors except one were employees of Murchie.

Finally, as must be obvious from the facts hereinbefore set out and from the reported decision of the Tax Court, the actual state of McCullough-Murchie-Dairy Queen affairs was not always what it appeared to be on paper.

While there is some evidence to support a finding that for part of 1957 and all of 1958 ownership of McCulloughs Dairy Queen, Inc., was not in Murchie and that he therefore was not a related person, and while we might or might not have reached a different conclusion with regard to such period than did the Tax Court, we cannot say on the whole record that it was clearly erroneous in finding that the purported transfers divesting Murchie of his ownership interest in Lark were not effective to that end because not intended to be so. Accordingly, the Tax Court properly disallowed Lark's deductions of the accrued

but unpaid Murchie accounting fees. Because of our conclusion as to this matter, we, like the Tax Court, do not reach the question of whether the claimed deductions were ordinary and necessary business expenses.

## MEDD LEVEL INCOME

■ Prior to September, 1955, the Medd Partnership was the licensed state operator of the Dairy Queen business in Ohio and Eastern New York. As such, it had rights to certain royalty income from sub-licensees. This was the so-called "Medd Level" income.

The Tax Court held that Lark was the owner of the Medd Level income during 1956, 1957 and 1958 and upheld the Commissioner's assessment of tax against it on that basis.

Again, an array of inconsistent and perplexing purported agreements and transfers is found in the record. Three agreements were executed by the interested parties during 1954 pertaining to the Medd interests, but none, according to the Tax Court's findings, with which we concur, was effective for the purposes outlined in said agreement.

On October 4, 1955, the Medd Partnership and Lark entered into yet another agreement, dated September 1, 1955, which did finally effectuate a transfer of the Medd interests. Under it, Lark acquired the Medd interests in Ohio and Eastern New York in return for the payment of $176,301.23. It is on the basis of this concededly *bona fide* and effective transfer to Lark that the Commissioner determined, and the Tax Court held, Lark taxable on the income derived from the Medd Level interests.

Lark, however, relies on yet another instrument which purports to be a transfer of the Medd Level interest from it to McCulloughs Dairy Queen, Inc. This instrument is dated November 1, 1955. The Tax Court found that this instrument was not effective to transfer the Medd Level interests.

Lark's position is that the earlier agreements, though they never became effective, show that it was always intended that McCulloughs Dairy Queen, Inc., should ultimately get the Medd Level interest. It urged the Tax Court to infer that what was not done by earlier purported agreements to that effect was finally done by the purported transfer of November 1, 1955.

The record indicates the following significant facts. No consideration was paid in connection with the purported transfer of November 1, 1955. The transaction was not recorded on the books of either Lark or McCulloughs Dairy Queen, Inc. Although the purported transfer was dated November 1, 1955, the Medd Level income for November and December 1955 was received by Lark, recorded on its books as income, reported on its income tax return as its income and was retained by it. The tax return of McCulloughs Dairy Queen, Inc., for the fiscal year ending March 31, 1956 shows no income and no deductions. The books and records of McCulloughs Dairy Queen, Inc., show no business transacted prior to March 31, 1957 other than the issuance of its original 100 shares to Murchie.

Considering the evidence pertaining to this issue in light of the whole record as previously discussed, we cannot say that the Tax Court was clearly erroneous in finding that the purported transfer of November 1, 1955 did not divest Lark of the ownership of the Medd Level interests. Accordingly, the Tax Court properly concluded that Lark was taxable on the income derived from the Medd Level during the years in question.

## MEDD'S LEGAL FEES

Pursuant to the October 4, 1955, contract of sale transferring the Medd Level interests to Lark, Lark agreed to pay $39,503.83 to the Medds' attorneys for fees incurred in connection with litigation between the Medds and their sub-licensees. The contract of sale provided in part as follows:

"That in further consideration of the aforesaid Contract of Sale, [Lark] agrees that [the Medd Partnership] is

obligated to pay the legal fees * * * for services rendered in connection with the prosecution of certain litigation * * * not to exceed [$]39,503.83 * * *, and [Lark] represents that said sum shall be paid from the assets acquired under this Contract, and guarantees that said sum shall be paid."

Pursuant to this provision, Lark issued checks totalling $39,503.83 to the Medds' attorneys on October 4, 1955. It deducted this sum on its 1955 income tax return as a business expense.

The Commissioner disallowed this deduction on the basis that the legal fees constituted a non-deductible capital expenditure.

In the Tax Court, Lark contended that the contract should not be taken at its face value. It asserted that the payment of the legal fees was not in fact "in further consideration" of the sale but was made pursuant to a pre-existing firm commitment by Lark to pay the Medds' legal fees incurred in connection with litigation with its sub-licensees.

On this appeal, Lark changes its emphasis somewhat, asserting that the contract of sale in addition to providing for the sale of assets also provides for the payment by the Medds to Lark of certain royalty delinquencies that had been withheld by the Medds. Lark claims that the payment of the legal fees was in consideration of the payment of these delinquencies and not in consideration of the transfer of property.

The Tax Court could find no prior commitment as alleged by Lark and was clearly correct in so doing. The only record citation offered by Lark on this point is to the opening statement of the Medds' attorney in the Tax Court. That statement, however, fails to support the contention for which Lark cites it. Furthermore, the detailed contract of sale makes no mention of any pre-existing commitment.

Lark's argument on this appeal boils down to an assertion that since the legal fees were to be paid out of cash transferred to it under the contract, it follows that their payment was in consideration of the delinquency payments. Such a provision is, however, equally consistent with the Medds' desire for certainty that the fees would be paid. We find no error in the Tax Court's finding that payment of the legal fees was in consideration of the transfer of property under the contract of sale.

The Tax Court then proceeded to hold that since the expenses were incurred for the purpose of defending and protecting the Medds' title or property rights in the Dairy Queen trade name and a trade phrase originated by the Medds, the expenditures were capital in nature and not deductible as a business expense. This holding of the Tax Court was correct. See Woodward v. Commissioner of Internal Revenue, 397 U.S. 572, 90 S.Ct. 1302, 25 L.Ed.2d 577 (1970); United States v. Hilton Hotels Corp., 397 U.S. 580, 90 S.Ct. 1307, 25 L.Ed.2d 585 (1970); Lykes v. United States, 343 U.S. 118, 72 S.Ct. 585, 96 L.Ed. 791 (1952); and Anchor Coupling Co. v. United States, 427 F.2d 429 (7th Cir. 1970).

Lark asserts it was never given an opportunity to litigate this question in the Tax Court and claims that the Commissioner conceded that either it or the Medds was entitled to a business expense deduction for the legal fees and that the Tax Court introduced a new issue by denying the deduction to both parties on the capital expenditure theory.

It seems clear that Lark had notice of the capital expenditure issue. The deficiency notice grounded the disallowance solely on that basis. Lark does not refer to any place in the record where the Commissioner states the extent of his neutrality before the Tax Court and we have been unable to locate such a statement in the record. Therefore, we can rely only upon the Tax Court's statement. The gist of that is that the Commissioner was neutral as to whether an expense deduction be given

to Lark or to the Medds. This is not to say that he conceded one or the other was entitled to it but only that if one was, the Commissioner was neutral as to which. This was apparently the understanding of the Tax Court. The Tax Court dealt fully with the issue and we are not persuaded that it caught Lark by surprise in so doing. Lark does not contend that it has any evidence apart from that already discussed and rejected by the Tax Court which would show that the expenditures in issue were not made in connection with the defense and purchase of a capital asset.

Thus, we conclude that the Tax Court properly sustained the disallowance of the deduction for the legal fees expenditure.

### COMPUTATION OF 2¢ EAST INCOME

The Commissioner determined Lark's income from 2¢ East by multiplying 2¢ times a figure representing the Commissioner's determination of the number of gallons of mix sold in various states. The gallonage figures of the Commissioner are significantly different from those reported in Lark's books and records for several states, which figures Lark contends are correct. The Tax Court allowed adjustments only as conceded by the Commissioner and denied all others, apparently relying upon the presumption of correctness which attaches to the Commissioner's determinations.

While there are some varying judicial opinions as to the exact scope and effect of the presumption in question, see, e. g., United Aniline Company v. Commissioner of Internal Revenue, 316 F.2d 701, 704 (1st Cir. 1963), it is clear that the burden is on the taxpayer to show by evidence that the Commissioner's determination is incorrect. See Barnes v. Commissioner of Internal Revenue, 408 F.2d 65, 68 (7th Cir. 1969), cert. den. 396 U.S. 836, 90 S.Ct. 94, 24 L.Ed.2d 86.

The record is devoid of any support whatsoever for the Commissioner's figures other than the presumption nor is there any indication whatsoever in the record that the figures in Lark's books were inadequate or erroneous. While the Commissioner may have been skeptical of any Lark documentation in view of the rather obvious machinations involved in the preparation of contractual instruments which apparently were designed for the purpose of the moment, this is no persuasive reason, in our opinion, for disregarding other books which as far as we can ascertain from the record were kept in the ordinary course of business.

We would not deny that where the record demonstrates that the particular books and records of the taxpayer are inaccurate or otherwise inadequate and where the taxpayer has presented no evidence of the true picture of his business, there may be reliance upon the presumption of correctness without more. Here, however, Lark presented books and records apparently complete and accurate on their face. The accountant who had prepared the books testified to the methods and sources of information employed in arriving at the figures reflected on those books. As far as we can see, there was no challenge to this testimony. We also note that other figures related to gallonage as reflected in Lark's books were accepted as correct by the Commissioner. There must be some indication in the record to persuade the reviewing court that the figures in the books were rejected on some basis other than a purely arbitrary one. See Barnes, supra, 408 F.2d at 69–70.

Having before us only Lark's totally uncontested and apparently accurate gallonage figures, we are unable to affirm the decision of the Tax Court sustaining deficiencies based solely upon the Commissioner's unsupported gallonage figures. This aspect of the case must be remanded for such further proceedings as the Tax Court may find necessary in order properly to assess the merits of

Lark's requested adjustments based on the discrepancies in gallonage figures.

## ACCOUNTANT'S FEES AS INCOME

In the Tax Court, the Commissioner conceded the correctness of certain of Lark's demands for a reduction of asserted deficiencies. Such reductions were permitted. All other reductions sought by Lark were denied in a one sentence ruling that "Other or larger amounts sought by [Lark] are not sustained on the basis of the record."

 The only reductions still in dispute pertain to certain claimed expenses for Murchie accounting fees. It would appear that Lark computed its gross income under Income Tax Regulation § 161–3(a) by deducting, among other things, the Murchie fee expenses. It then increased its gross income by the amount of such fee expenses allocated to the 2¢ East and Medd Level incomes. It now contends that its gross income should be reduced by a like amount since it has been determined that Lark owns the 2¢ East and Medd Level incomes so that the expense allocations to such incomes become expense allocations to itself. However, the essence of the transaction remains that Lark is seeking to deduct professional fee expenses from its income. It is axiomatic that it must prove its right to such a deduction before it will be allowed. *See* Landfield Finance Co. v. United States, 418 F.2d 172, 175–176 (7th Cir. 1969) and cases cited therein. We have already held that the Murchie fee expenses are not deductible by Lark and can see no reason to treat them differently here.

On the basis of the foregoing opinion, the decision of the Tax Court is reversed and remanded for further proceedings not inconsistent herewith insofar as: (a) it denied Lark's request to eliminate from its federal income tax returns for the years 1955 through 1958 amounts reported as accrued income from the so-called Ar-Tik Expense Allocations and (b) it sustained the Commissioner's assessment of 2¢ East income based upon gallonage figures differing from the uncontested and apparently accurate figures contained in Lark's books and records.

In all other respects the decision of the Tax Court is affirmed.

Affirmed in part reversed and remanded in part.

### On Petition for Rehearing.

PELL, Circuit Judge.

Having considered the petition for rehearing filed herein by appellant Lark Sales Company and the answer thereto of appellee Commissioner of Internal Revenue, the petition is denied.

Lark first requests that the remand of this cause to the Tax Court be enlarged to include consideration of certain adjustments apart from those already included. Lark's original brief in this large and complex case devoted seven lines to these adjustments. Lark even now does little more than suggest to us questions raised by certain testimony and exhibits without otherwise showing support for its position. Our examination of the testimony and exhibits submitted to the Tax Court indicates that they do not cover all of the adjustments claimed. To the extent that they do, the adjustments were allowed by the Commissioner. The Tax Court determined that the record did not support further adjustments and we must agree. If Lark was entitled to some or all of the claimed adjustments, it had the burden to show it. It has failed to meet that burden by its sketchy presentation here and in the Tax Court.

 Lark is correct in saying, in support of its second ground for rehearing, that its gross income should not be increased by more than the total collections of 2¢ East and the Medd Level found to be its property. However, it is incorrect in asserting that the opinion of this court requires more than that by denying the deduction of the Murchie fees attributable to the 2¢ East and Medd Level income. All that we require

is that Lark's gross income include the full amount of the 2¢ East and Medd Level incomes. To the extent that its filed returns already reflect a portion of such income in gross income as "Sales —Expense Allocations," no further increase is necessary under the opinion of this court. However, once the proper figure for gross income, including the 2¢ East and Medd Level collections, is computed, no deduction from that figure is to be taken for the Murchie fee item, whether that item is attributable to the collections of 2¢ East, Medd Level or other income. The Tax Court will in any event upon remand have to recompute Lark's taxable income for the years in question and should do so in the light of the foregoing explanation of that part of our original opinion pertaining to accountant's fees as income.

Lark's final ground for rehearing simply challenges this court's assessment of the record support for certain findings of fact. We are not persuaded that such assessment merits reconsideration.

Petition for rehearing denied.