DANIEL A. MARKMAN and ESTATE OF IRIS M. MARKMAN, DANIEL A. MARKMAN, ADMINISTRATOR, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Markman v. Commissioner
Docket Nos. 9506-79, 20381-80.
United States Tax Court
T.C. Memo 1987-407; 1987 Tax Ct. Memo LEXIS 404; 54 T.C.M. (CCH) 154; T.C.M. (RIA) 87407; August 20, 1987. *404 Petitioner-husband operated a dental practice and engaged in the trade or business of horse racing during 1975 and 1976. Held: (1) Petitioner-husband's dental practice income for 1975 and 1976 was underreported. Amounts determined. (2) Petitioner-husband's loss from horse racing in 1975 did not exceed the amount stipulated to by the parties. (3) Petitioners are liable for an addition to tax under sec. 6653(a), I.R.C. 1954, for 1976. Marvin Klamen and Henry S. Shaw, for the petitioners. Henry Thomas Schafer, for the respondent. CHABOT
MEMORANDUM FINDINGS OF FACT AND OPINION CHABOT, Judge: Respondent determined deficiencies in Federal individual income taxes and an addition to tax under section 6653(a)[1] (negligence, etc.) against petitioners as follows: Addition to Tax
Docket No.
Year
Deficiency
Sec. 6653(a)
9506-79
1975
$ 94,136.43 [2]
None
20381-80
1976
37,510.00
$ 1,876.00
These two cases *405 were consolidated for trial, briefs,and opinion. After concessions by both sides, the issues for decision [3] are as follows: (1) Whether petitioner-husband and unreported income from the practice of dentistry in 1975 and 1976; (2) Whether petitioners are entitled to additional 1975 deductions for horse racing expenses; and (3) Whether petitioners are liable for an addition to tax under section 6653(a) for 1976. FINDINGS OF FACT [4] *406 Some of the facts have been stipulated; the stipulations and the stipulated exhibits are incorporated herein by this reference. When the petitions were filed in the instant cases, petitioners [5] resided in Illinois. During 1975 and 1976, Daniel and Iris were parents of the following children: Wayne S. Markman (hereinafter sometimes referred to as "Wayne"), Linda B. Klien (hereinafter sometimes referred to as "Linda"), Ellis B. Markman (hereinafter sometimes referred to as "Ellis"), and Elyse A. Markman. Daniel, a dentist, *407 was awarded a D.D.S. degree from St. Louis University in 1948. After graduation, Daniel worked with the United States Public Health Service until 1949. After leaving the Public Health Service, Daniel bought a dental practice in St. Louis. Daniel has been involved with his practice for at least 32 years. Before graduation, Daniel had worked as a social worker. When Daniel bought the practice in 1949, St. Louis was changing. People were leaving the inner city. When Daniel bought the practice, the building in which his office was located held more than one hundred doctors, but they were moving out as fast as they could. Daniel's patients came from a low socioeconomic area. Daniel worked many hours each day. During late 1975 the building in which he worked had gone into decay. There were only three or four doctors in the whole building and Daniel's office was the only one open on its floor. Before September 1975, Daniel's dental practice had no employees. In September 1975, Daniel employed Wayne to work in the practice. Wayne was graduated from the University of Missouri, Kansas City Dental School and was a practicing licensed dentist in Missouri. Wayne first received his *408 license to practice dentistry in September 1975, about the time he began to work as Daniel's employee. Wayne's salary for 1975 was $ 7,200, and for 1976 was $ 38,342. Daniel hired dental assistants after Wayne started working for him. Daniel hired an additional dentist, Barry Liebman (hereinafter sometimes referred to as "Liebman"), about October or November 1975. Liebman left Daniel's employ in early 1976, having received $ 5,112.75 for 1976. Dental Practice Records
For some time until November 11, 1976, Daniel used the following procedure to record the receipts and maintain the accounts receivable of the dental practice: When a patient came to Daniel for dental work, Daniel performed the work and then wrote on the back of one of his business cards the total charge for the service. When the patient made a payment, the amount of the payment was deducted from the amount shown on the back of the card. The patient kept the card in his or her possession. Daniel did not keep any record of what any of his patients owed him; the only such record was on the business card that was kept by the patient. Many of Daniel's patients paid by cash; others paid by check. When money in the form *409 of cash or check was received in Daniel's dental practice office, at a minimum, the date, the payor's name, and the amount of the remittance were recorded on a sheet of paper (hereinafter sometimes referred to as a "patient receipt record") kept in the office for that purpose. Daniel kept the patient receipt records in the ordinary course of his dental business. Sometimes, Daniel lent money to patients. Repayments of these loans were recorded on the patient receipt records. At times, a patient paid on completion of the dental service, the amount was recorded in the patient receipt record, when the insurance carrier paid Daniel he issued a refund to the patient, but the insurance company's check also was recorded in the patient receipt record. Daniel experienced bad checks. Each bad check, even duplicates, was recorded on the patient receipt records. Daniel also cashed checks for patients or allowed them to write checks for more than the amount of his fee, the excess being remitted in cash. These checks were also recorded on the patient receipt records. As cash and checks were received, a pool of funds was created out of which various disbursements were made. Some of the checks *410 that Daniel received were endorsed over to third parties, such as dental suppliers and dental laboratories, in payment of amounts due them. Cash was used to buy lunches, used to pay Daniel's employees, used to pay suppliers, or kept by Daniel. The balance of cash and checks remaining after these transactions would usually be deposited that night or at noon. These deposits were made to one of two bank accounts maintained at the Mercantile Commerce Trust Company (hereinafter sometimes collectively referred to as "the practice receipts account"). [6] In 1976, the total deposits to the practice receipts account from the dental practice were $ 105,935.28. In 1976, Daniel regularly checked or reviewed the patient receipt records. If there appeared to be an error, then Daniel brought the error to the attention of the employee whose error it appeared to be. In 1976, Daniel made a nightly reconciliation between the cash and checks on hand at the end of the day and the total of the day's entries as reflected on the patient receipts records. Any difference between the two totals would usually be resolved *411 through discussions between Daniel and the employees. Certified public accountants hired by Daniel in November 1976 (hereinafter sometimes referred to as "the CPAs" were unable to reconcile the receipts shown on the patient receipt records with the deposits made to the practice receipts account. Daniel determined how much he drew as "salary" based on how much cash was left after the dental practice's bills were paid. For 1975, the patient receipt records were kept in a wirebound notebook. For 1976, receipts for January and part of February were recorded in the same wire-bound notebook, and the remainder of the 1976 receipts through November 11, were recorded on looseleaf paper. In November of 1976, on the recommendation of the CPAs, Daniel installed a "one-write" bookkeeping system to record receipts and disbursements. Under the "one-write" bookkeeping system, all of Daniel's dental practice receipts were deposited into the practice receipts account. The "one-write" records reflect accurately the dental practice receipts by Daniel in the amounts shown in table 1. Table 1
Period
Amount
11-12-76 to 11-30-76
$ 11,888.60
12-01-76 to 12-31-76
$ 19,483.35
In preparing their joint 1975 *412 Federal individual income tax return, Daniel and Iris totaled the patient receipt records for 1975. Daniel and Iris elected cash basis reporting and reported the total from the patient receipt records for 1975 of $ 114,823.07 as gross receipts from the dental practice. Daniel's patient receipt records for 1975 show receipts in the amounts set forth in table 2. Table 2
Month
Amount
Month
Amount
January
$ 6,096.60  July
$ 7,899.67
February
10,080.25  August
8,942.30
March
8,306.32  September
9,155.30
April
9,576.75  October
15,066.72
May
8,080.85  November
12,386.21
June
8,078.51  December
11,153.59
Total
$ 114,823.07
Daniel and Iris claimed Ellis as a dependent on their 1975 tax return. In 1975, Ellis was 21 years old. Daniel and Iris paid their children's school tuition and much of their children's living expenses while the children were in school. Beginning in the 1950's, respondent audited Daniel's and Iris' tax returns every few years. For 1972, 1973, and 1974, Daniel and Iris reported on their tax returns the amounts shown in table 3. Table 3
Adjusted Gross
Net Dental
Year
Income
Practice Income
1972
$ 9,381 ($ 3,394)
1973
17,001
496 1974
26,202
10,138 The patient receipt records for 1972, 1973, and 1974 were *413 maintained in a format similar to those for 1975. Table 4 shows the total receipts per the patient receipt records for each of these years. Table 4
Year
Total Receipts
1972
$ 39,525.63
1973
52,039.87
1974
74,201.20
1975
114,823.07
In early 1975, respondent began to audit Daniel's and Iris' 1972 and 1973 tax returns. By March 24, 1976, the audit had been expanded to include their 1974 tax return, respondent had begun to use a special agent in the audit, and Daniel had become aware that the audit was concerned with deposits to accounts in the names of Daniel, Iris, and their four children, maintained at the Chesterfield Bank in Chesterfield, Missouri (hereinafter sometimes collectively referred to as "the Chesterfield Bank accounts"). Iris died on May 2, 1977. In January 1978, respondent proposed that Daniel and Iris had underreported their income, resulting in proposed adjustments, deficiencies, and additions to tax in the amounts shown in table 5. Table 5
Proposed
Proposed
Adjustments
Proposed
Additions to Tax
Year
To Income
Deficiencies
Sec. 6653(a)
1972
$ 24,581.43 [7] *414 $ 6,316.64
$ 315.83
1973
20,162.35 [8]
4,723.42
236.17
1974
16,800.00 [9]
7,974.74
398.74
The above-proposed adjustments were based on unexplained deposits made during the respective years into the Chesterfield Bank accounts. [10] On January 18, 1978, petitioners executed respondent's Form 4549, "Income Tax Examination Changes", thereby agreeing to the assessments of the proposed deficiencies in income taxes and additions to tax under section 6653(a), as shown in table 5. In May 1978, Daniel was informed of respondent's intent to audit Daniel's and Iris' 1975 and 1976 tax returns. The actual audit began in the fall of 1978. The revenue agent made a standard request for all records relating to Daniel's and Iris' activity for 1975, to include *415 bank statements, canceled checks, any type of schedules or books that were used in preparing the tax return, and any other documents that would be of assistance. In response to this request the revenue agent was provided with some of the 1975 Mercantile Commerce Bank statements and canceled checks, part of the 1975 checkbook and a few scattered horse racing receipts that made no sense to the revenue agent. In December 1978 the revenue agent asked for additional information as follows: 1. A Schedule of Income and Expenses on the horse racing activity, which will show how the ($ 11,000.45) loss was arrived at. 2. A schedule, explanation, etc., which will show how the dental practice gross receipts were arrived at. 3. Bank statements, cancelled checks, and passbooks for all of Dr. Markman's Chesterfield bank accounts, and those of his dependent children, and any other bank accounts at any other bank. Also January, February, and March statements of the dental practice account. As of early January 1979, the additional documents requested had not been furnished to the revenue agent. On January 15, 1979, the revenue agent served summonses on the Mercantile Commerce Trust Co. and the *416 Chesterfield Bank in order to obtain all bank records showing 1975 and 1976 transactions in accounts over which Daniel or Iris had any power. On January 26, 1979, petitioners' then counsel stayed compliance of the summonses pursuant to section 7609 by sending notice to both Mercantile Commerce Trust Co. and Chesterfield Bank directing them not to comply with the summonses. Respondent chose not to seek judicial enforcement of the summonses for 1975. A notice of deficiency for 1975 was issued to petitioners on April 5, 1979, because of the imminent expiration of the statute of limitations. During the period from December 18, 1978, through April 15, 1979, petitioners declined to consent to extend the statute of limitations for assessment and collection of income taxes with respect to 1975. In the fall of 1979, petitioners agreed to furnish and did furnish the information requested for both 1975 and 1976. The 1975 deposits to the Chesterfield Bank accounts plus the dental practice deposits to the practice receipts account totalled $ 188,859.64. After elimination of deposits representing salary, transfers, or interest, deposits in 1975 in the Chesterfield Bank accounts in amounts *417 shown in table 6 remained unexplained. Table 6
Name on
Unexplained
Account No.
Signature Card
Deposits
1-10-6011-7
Iris [11] $ 3,896.29 7422-9
Ellis
11,179.53
10-5929-2
Linda
751.50
10-6737-7
Ellis
[12] *418 $ 5,188.72
01-006944-0
Ellis, Iris, Daniel [13]
[14] 20,000.00
10-2629-2
Wayne
[15] 3,547.61
10-7159-0
Ellis, Daniel
1,753.79
$ 46,317.44
The signature cards for all the accounts listed in table 6 showed Daniel's and Iris' residential address. Bank statements for all these accounts were mailed to Daniel's and Iris' residential address for all of 1975 with two exceptions. [16] (All of these accounts, except the Iris account, were used by respondent to compute the adjustments *419 to Daniel's and Iris' income for one or more years in the 1972-1974 period, adjustments to which petitioners agreed.) The revenue agent analyzed the 1975 deposits to the practice receipts account and concluded that of the total deposits to that account for 1975, $ 38,448.43 were deposits from the dental practice and $ 4,634.60 were unidentified deposits. The remaining deposits to this account for 1975 were from a loan or Daniel's trade or business of horse racing. The revenue agent further concluded that Daniel paid $ 70,531.46 of expenses in 1975 from patient receipts that were never deposited in the bank. Deposits to the practice receipts account that the revenue agent concluded were from Daniel's dental practice totalled $ 1,829 for January 1975. There are $ 800 in unexplained deposits in other Chesterfield Bank accounts in January 1975. In the notice of deficiency for 1975, respondent determined an adjustment *420 to income which included an understatement of receipts in the amount of $ 18,264.30. In making this determination, respondent first computed the mean of the percentages of expenses to gross receipts for petitioner for 1972, 1973, 1974, and 1976 as shown in table 7. Table 7
1972
1973
1974
1976
Receipts
Gross receipts
per return
$ 39,525.63
$ 52,039.87
$ 74,201.20 $ 210,824.00 Additional receipts
per audit adjustments
24,581.43
20,162.35
16,800.00 --
Decrease by wage
expense     --         --         --    (47,172.00)
Total receipts as
adjusted
$ 64,107.06
$ 72,202.22
$ 91,001.20 $ 163,652.00 Expenses
Total expenses
per return
[17] $ 42,919.58
$ 51,543.64
$ 64,063.64 $ 174,255.00 Correction to
expanses per audit
adjustments (see
166.69
1,326.75
(2,694.32)
-- notes 7, 8, and 9, supra)
Decrease for wage
expense     --         --         --O    (47,172.00)
Expenses as adjusted
$ 43,086.27
$ 52,870.39
$ 61,369.32 $ 127,083.00 Expenses as a per-
centage of receipts
67.21%
73.23%
67.44%
77.65%
Average percentage of expenses to gross receipts: 71.38%
Respondent assumed *421 that the expenses in 1975 would be the same percentage of gross receipts as the average computed as above. Accordingly, respondent divided the dental practice expenses reported by Daniel and Iris for 1975 by the above-computed average, to derive his determination of gross receipts, as follows: $ 94,997.77 / 71.38% = $ 133,087.37 [18]
Daniel and Iris reported gross dental practice receipts of $ 114,823.07 for 1975. Respondent determined the $ 18,264.30 difference (between $ 133,087.37 and $ 114,823.07) was the amount by which Daniel and Iris underreported gross dental practice receipts for 1975. Daniel's and Iris' 1976 tax return was prepared by the CPAs. In preparing the 1976 tax return, the CPAs rejected the patient receipt records as meaningless and unsupportable. Instead, they began by attempting to identify the source of the funds deposited to the practice receipts account. All deposits that could not be identified were treated as income from Daniel's dental practice, and subject to tax. The *422 CPAs then contracted Daniel's suppliers and received from them information as to how much they had received from Daniel in 1976. From these totals, the CPAs deducted the amounts of the payments made to the suppliers that appear in Daniel's and Iris' checkbook. Daniel had a habit of endorsing checks from patients over to his creditors in payment. Consequently, the resulting balance was assumed to be amounts paid to suppliers out of funds received but never deposited. The balance of the amounts paid to suppliers was included in the reported dental practice income. This amounted to $ 63,323,65. The same amount was treated as an expense item and was included with the checkbook payments in the computation of total expenses. Similarly, wages paid in cash were recorded as expenses and an offsetting increase in patient receipts was made. The total of these payments to employees was $ 41,565.25. Disbursements from the practice receipts account in the form of checks to Daniel or to "cash" total $ 5,160 for 1976. Of the $ 5,160 amount, $ 4,850 of checks are dated after November 11, 1976. The CPAs did not include in their calculations any amount for Daniel's "salary" that was taken in *423 cash. Daniel paid for his personal living expenses in 1976 out of his "salary" draws. In determining the deficiency for 1976, respondent first totalled the patient receipt records for January 1, 1976, through October 31, 1976 ($ 251,141.57). To this total respondent added deposits to the practice receipts account for November 1976 of $ 15,294.20 and December 1976 of $ 19,614.30. These amounts totalled $ 286,050.07. From this total respondent subtracted total patient receipts as reported on Daniel's and Iris' tax return for 1976 of $ 210,824. The result of $ 75,226 [19] was determined by respondent to be unreported income. In 1976, deposits were made to Chesterfield Bank accounts maintained by members of the Markman family, as shown in table 8. Table 8
Account No.
Total
Transfers, Salary,
Unexplained
and Name
Deposits
and Interest
Deposits
1-109-6011-7
[20] *424 $ 28,461.69
$ 16,842.94
$ 11,618.75
Iris
7422-9
6,922.30
1,239.58
5,682.72
Ellis
10-5929-2
1,081.00
-0-    1,081.00
Linda
10-6737-7
[21] 20,780.71
12,276.14
8,504.57         Totals
$ 57,245.70
$ 30,358.66
$ 26,887.04
1975 Horse Racing
Daniel and Iris reported on their 1975 tax return a loss of $ 11,000.45 incurred in the trade or business of horse racing. [22] *425 In the notice of deficiency, respondent determined that the horse racing activities resulted in a $ 43,308 profit for 1975. [23] Accordingly, respondent made an adjustment of $ 54,308.45 to Daniel's and Iris' taxable income. [24] In their petition, petitioners claim that Daniel's correct horse racing expenses are $ 98,781. Daniel's 1975 horse racing receipts were $ 86,031; his deductible horse racing expenses for 1975 were $ 98,792.52. * * * Daniel had unreported income from the practice of dentistry in 1975 of $ 18,264.30. Deposits of $ 26,887.04 to the Chesterfield Bank accounts were taxable gross receipts of Daniel and *426 Iris in 1976. Daniel took cash draws totalling $ 40,000 from dental practice receipts during the period January 1, 1976, through November 11, 1976. Daniel's total receipts from the practice of dentistry were $ 277,711.22 in 11976, which is $ 66,887.22 more than Daniel and Iris reported on their 1976 tax return. Daniel sustained a net loss from his trade or business of horse racing in 1975 of $ 12,761.52, which is $ 1,761.07 more than the loss that Daniel and Iris deducted on their 1975 tax return. Some part of petitioners' 1976 underpayment of tax is due to negligence. OPINION I. 1975 and 1976 -- Dental Practice
Petitioners contend that for 1975, the "focal point" is in the methodology and formula used by respondent in determining Daniel's dental practice income; that respondent's method was arbitrary, capricious, and unreasonable. Petitioners assert that, for 1976, respondent knew of, and had access to, books, records, and summaries prepared by petitioners' accountants; they contend that respondent's decision to rely solely on the patient receipts records was "clearly" arbitrary, capricious, and unreasonable. Respondent contends that petitioners' refusal to provide information *427 necessary to audit the 1975 tax return justifies respondent's resort to an indirect method of proof, and that the projection formulation used was reasonable. Respondent maintains that, with the exception of alleged undocumented loan repayments (of insignificant amounts), the gross 1976 dental practice receipts are accurately reflected n Daniel's patient receipts records. We agree in general with respondent's conclusions. [25] We are generally concerned herein with the amount of gross income from Daniel's dental practice. Gross income *428 includes gains derived from business, including the practice of dentistry. Section 61(a)(2). [26]Because Daniel utilized the cash method of accounting for his income from the dental practice, dental practice receipts are recognized as income in the year received. Section 451(a); section 1.451-1(a), Income Tax Regs. Accordingly, we are concerned with determining the correct amount of dental practice receipts for 1975 and 1976. A. 1975 Dental Practice Receipts
Respondent's factual determinations in a notice of deficiency are presumed to be correct; except where otherwise provided in the statute or the Tax Court Rules of Practice & Procedure, the burden of proof is on petitioners. Welch v. Helvering,290 U.S. 111, 115 (1933); Rule 142. Petitioners' primary contention for 1975, that we should strike down respondent's determination based on the methodology used in determining *429 the deficiency, is without merit. Except for declaratory judgments, a trial before this Court is a proceeding de novo. Our determination of petitioners' tax liability is based on the evidence produced at trial and, ordinarily, not on the record developed at the administrative level. Greenberg's Express, Inc. v. Commissioner,62 T.C. 324, 328 (1974). Accordingly, we generally will not examine the basis for a notice of deficiency. Kenyatta Corp. v. Commissioner,86 T.C. 171, 180 (1976), affd. without published opinion (CA9-1987). We see no reason to depart from this rule in the instant cases. Furthermore, since petitioners failed to provide respondent with requested books and records before the notice of deficiency was issued, respondent's determination in the absence of an opportunity to review the books and records will not be deemed "arbitrary and excessive as contended by the petitioners. Thus, its presumptive correctness has not been destroyed, and the burden of disproving it still rests with the petitioners." Schellenbarg v. Commissioner,31 T.C. 1269, 1277 (1959), affd. in part and revd. in part on another issue 283 F.2d 871 (CA6 1960). Accordingly, we proceed to the evidence *430 as it appears in the record. Initially, we note that the 1975 patient receipt records support the amount of gross dental practice receipts reported on Daniel's and Iris' 1975 tax return. In that the patient receipt records were regularly kept in the ordinary course of Daniel's business, they will not be disregarded absent a showing that they are inadequate or erroneous. Lark Sales Company v. Commissioner,437 F.2d 1067, 1078 (CA7 1970), affg. in part and revg. in part a Memorandum Opinion of this Court; [27]Estate of Hill v. Commissioner,59 T.C. 846, 857 (1973). Respondent contends that Daniel's 1975 patient receipt records are in error in that they understate Daniel's dental practice receipts. At the same time, however, respondent urges us to rely on the 1976 patient receipt records as being accurate. Petitioners urge us to rely on the 1975 patient receipt records, *431 but contend that the 1976 records overstate Daniel's receipts and so should be disregarded. We agree with both sides' contentions, while rejecting both sides' urgings. [28] On the one hand, the patient receipt records overstated actual receipts by including loan repayments, by including checks that were cashed as accommodations to patients, *432 and by doublecounting insurance payments and bad checks. On the other hand, there is no way to gain assurance that all receipts were recorded. Daniel did not maintain accounts receivable records that could be used to check the accuracy of the patient receipt records. Daniel's habit of using patient receipts (both cash and checks) directly to pay for supplies and other business expenses, without running the receipts through the practice receipts account, contributed to the difficulties encountered by both respondent and the CPAs. Finally, there is the troubling problem of substantial unexplained deposits to the Chesterfield Bank accounts. The record reveals several differences between the trustworthiness of the1975 patient receipt records and that of the 1976 patient receipt records. For most of 1975, unlike 1976, Daniel was the only person in his very busy office and thus had the clear opportunity to omit recording amounts whether because of the pressure of work or because of a desire to falsify records. Because of the presence of employees who dealt with the receipts in 1976, and Daniel's nightly reconciliations to be sure that there was no theft, it is less likely that significant *433 amounts of receipts from patients were not recorded in the patient receipt records. Also, for about the last 7 weeks of 1976, a new accounting system was introduced that appears to have largely eliminated errors. From the foregoing, we conclude that the 1976 patient receipt records are likely to have overstated Daniel's dentistry receipts and the 1975 patient receipt records are likely to have understated Daniel's dentistry receipts. It is well established that bank deposits are prima facie evidence of income where the deposits were made by the party charged with income or to an account controlled by the party charged with income. Tokarski v. Commissioner,87 T.C. 74, 77 (1986); see Estate of Mason v. Commissioner,64 T.C. 651, 656-657 (1975), affd. 566 F.2d 2 (CA6-1977); Mauch v. Commissioner,35 B.T.A. 617, 627 (1937), affd. 113 F.2d 555 (CA3 1940). On brief, petitioners ignore the unexplained bank deposits, notwithstanding (1) this state of the law as to the effect of unexplained bank deposits, (2) the many stipulations and exhibits relating to bank accounts of Daniel, Iris, and their children, as well as analyses by respondent's agents, and (3) respondent's reliance, on opening *434 brief, on the unexplained bank deposits. Instead, petitioners attack the formula that respondent used to determine unreported income for 1975 (see table 7 and the accompanying text, supra), contend that this formula is "arbitrary, capricious and unreasonable", and conclude that "[t]he evidence before the Court is clearly sufficient to warrant the Court's determination that there was no deficiency for the tax year 1975." We regret petitioners' failure to assist the Court in analyzing the unexplained bank deposits. We have nevertheless viewed the unexplained bank deposits with a critical eye. Giving petitioners the benefit of doubts that we have raised, we conclude that the unexplained bank deposits provide sufficient support for respondent's determination that Daniel and Iris failed to report $ 18,264.30 of dental practice income for 1975. Respondent contends that petitioners should be charged for 1975 with $ 46,417.54 of unexplained deposits to the Chesterfield Bank accounts. [29] Petitioners have not suggested that any of the deposits are explained as coming from sources that are not taxable to petitioners. Petitioner have not suggested any reason why any of the Chesterfield Bank *435 accounts should not be taken into account for purposes of determining unreported income. We note that Daniel and Iris did not claim Linda as a dependent for 1975. They also did not claim Wayne as a dependent, but the evidence is clear that Daniel and Iris were supporting Wayne (and were having deposits made into his Chesterfield Bank account) until Wayne began to work for Daniel in September 1975. In 1975, Ellis was 21 year old. The evidence is unclear as to whether he was attending college at that time. Daniel and Iris claimed Ellis as a dependent on their 1975 tax return. If Ellis was not a full-time student in 1975, then the claimed dependence deduction required that Ellis have less than $ 750 gross income for that year (sec. 151(e)(1)(A)). [30] If Ellis was a full-time student in 1975, then the $ 750 limit was not applicable (sec. 151(e)(1)(B)), but Daniel and Iris would have paid Ellis' tuition and living expenses. In the one case, Ellis was not likely to have contributed to the unexplained deposits; in the other, Daniel and Iris would *436 have incurred more personal expenses; in either case, Daniel and Iris would have contributed more than half of Ellis' support (sec. 152(a)(1)). Under the circumstances, it is not unreasonable to expect Daniel to be knowledgeable about, and be able to explain to the Court, significant deposits to Ellis' accounts. We note that $ 20,000 consists of a single deposit made on January 30, 1975. See n. 14, supra. Although petitioners have not raised the matter, we believe it is unlikely that this deposit could have resulted from omitted receipts from Daniel's dental practice for the first 30 days of 1975. Even if we were to resolve in petitioners' favor any doubts about the unexplained deposits into the Chesterfield Bank accounts, we still would be left with unexplained deposits that exceed the amount that respondent determined as unreported income for 1975. We conclude that Daniel and Iris omitted from their 1975 income at least the amount that respondent determined. Petitioners' analysis of the law, *437 as applied to the facts of the instant cases, is as follows: The burden is on Petitioners to show the Respondent's formula was wrong, but not to prove the correct amount. Helvering v. Taylor, 293 U.S. 507 (1935), affirming 70 F.2d 619 (2nd Cir. 1934), reversing and remanding 27 B.T.A. 1426 (1933). In providing overwhelming evidence that the formula used by Respondent was arbitrary, unreasonable and capricious, Petitioner has overcome the presumption of correctness of the findings contained in the deficiency notice. * * * Petitioners have missed the point of Helvering v. Taylor, supra. In that case, the taxpayer did not merely show that respondent's notice of deficiency was incorrect. The taxpayer in Helvering v. Taylor also convinced the courts that respondent's error resulted in a determination of a greater tax liability than the taxpayer's true tax liability, i.e., that respondent's determination was "excessive." The Supreme Court stated its conclusion as follows (293 U.S. at 515): Unquestionably the burden of proof is on the taxpayer to show that the commissioner's determination is invalid. Lucas v. Structural Steel Co.,281 U.S. 264, 271. Wickwire v. Reinecke,275 U.S. 101, 105. *438 Welch v. Helvering,290 U.S. 111, 115. Frequently, if not quite generally, evidence adequate to overthrow the commissioner's finding is also sufficient to show the correct amount, if any, that is due. See, e.g., Darcy v. Commissioner,66 F.(2d) 581, 585. But, where as in this case the taxpayer's evidence shows the commissioner's determination to be arbitrary and excessive, it may not reasonably be held that he is bound to pay a tax sufficient also to establish the correct amount that lawfully might be charged against him. * * *
This was foreshadowed by Cohn v. Commissioner,39 F.2d 540, 544 (CA2 1930), in which the Circuit Court of Appeals held that it was reversible error to rule for respondent and disallow all deductions, where we were convinced that the taxpayer had made some deductible expenditures but could not tell how much. In Cohan, too, the question was not simply whether respondent's determination had been shown to be wrong, but rather whether it had been shown to be excessive. This matter was more clearly explained in Giddio v. Commissioner,54 T.C. 1530, 1534 (1970), as follows: In Estate of Peter Finder,37 T.C. 411, 423 (1961), the Commissioner assigned erroneous reasons *439 for the disallowance of a deduction for depreciation, yet the burden of proof remained with the taxpayer. See also Angellino v. Commissioner,302 F.2d 797 (C.A. 3, 1962), affirming on this point a Memorandum Opinion of this Court. In all of these cases the accuracy of the determination rather than the method of computation was the controlling factor in determining the validity and effect of the notice of deficiency. Indeed, in Rouss v. Bowers, supra, [30 F.2d 628] at 630, the court said that even "assuming * * * the Commissioner's method was arbitrary, this cannot avail * * * [petitioner] in the absence of any showing that it resulted in an erroneous assessment." See also Bishoff v. Commissioner, supra [27 F.2d 91] at 93. * * * In the instant cases, both sides deal with the method that respondent used to determine Daniel's dental practice receipts for 1975. We acknowledge doubts about the appropriateness of certain aspects of that method. However, the question is not whether petitioners have shown that respondent's method of determining Daniel's dental practice receipts was arbitrary -- or even that it was wrong -- but rater the question is whether petitioners have shown that *440 respondent's determination was excessive. Petitioners have failed to show that it was excessive. Indeed, the evidence (chiefly as to unexplained bank deposits and inadequate records) tends to show that respondent's determination was not excessive. We hold for respondent on this issue. [31]
B. 1976 Dental Practice Receipts
Daniel kept records of his 9176 gross dental practice receipts by recording in the patient receipt records the date, the payor's name, and the amount, as a minimum for each receipt. The total receipts as reflected in the patient receipt records for January through October plus the bank deposits to the practice receipts account for November and December exceeded the total gross receipts reported on Daniel's and Iris' 1976 Federal individual income tax return; respondent determined an adjustment to income to the extent of this excess. See n. 19, surpa.
Petitioners contend that they have overcome the presumption of correctness of *441 respondent's determination in the notice f deficiency, and have shown the correct amount of dental practice income for 1976. Respondent asserts that the patient receipt records correctly reflect Daniel's dental practice gross receipts. We agree with petitioners that respondent's determination in the notice of deficiency was excessive, but only to the extent of $ 8,338.78. Respondent's determination as to Daniel's dental practice income is presumed to be correct; petitioners have the burden of proving respondent's determination is in error; Rule 142. It is clear to us that the patient receipt records include some items that were not income. It was Daniel's practice to record all items received, whether they constituted income or were receipts of another nature. Petitioners have shown, and we are convinced, that Daniel occasionally loaned money to his patients. The repayments of these loans, while not constituting income, were nonetheless recorded on the patient receipt records. Daniel also billed insurance companies. Some of the patients paid on completion of the dental services. When the insurance company paid, the receipt was recorded and a refund given to the patient. In *442 this manner, the patient receipt records tend to reflect duplicate amounts. Daniel also occasionally cashed checks for his patients. If cash was available, Daniel allowed the patient to write a check for more than the amount of the dental fee, and the excess was returned to the patient in cash. The check was recorded on the patient receipt records in the full amount. The result is an exaggeration of the amount of income. In addition, not all of the checks received were honored. Some were returned, the patients' bank accounts containing insufficient funds. In this manner, as well, the patient receipt records overstate the amount of income that Daniel actually realized. Although we are convinced that the patient receipt records overstate Daniel's 1976 dental practice receipts, petitioners have failed to show the extent of the excess. I the language of Helvering v. Taylor,293 U.S. at 515, "it may not reasonably be held that [petitioners are] bound to pay a tax that confessedly [they do] not owe, unless [their] evidence was sufficient also to establish the correct amount that lawfully might be charged against [them]." The uncertainties arise from Daniel's inadequate record-keeping *443 practices. Under these circumstances, it is the Court's duty to "make as close an approximation as it can, bearing heavily if it chooses upon the taxpayer whose inexactitude is of his own making." Cohan v. Commissioner,39 F.2d at 544. The CPAs determined Daniel's 1976 gross dental practice receipts by an indirect method. Initially they totalled the deposits to the practice receipts account, excluding from the computation those deposits which could be identified as from a source other than patient receipts. To this sum was added an amount determined to be payments to suppliers and employees that had not been made from the practice checking account. This total ($ 210,824.18, rounded to $ 210,824 on Daniel's and Iris' 1986 tax return) was then considered total patient receipts. Although the CPAs recognized that Daniel often used cash to pay Wayne's and Liebman's salaries, they did not consider that Daniel may have used cash for his own, nonbusiness, purposes. Daniel testified that he paid for his personal living expenses in 1976 out of his "salary". When asked how his salary was determined, Daniel responded as follows: "Whatever was available. When my bills were paid and there *444 was something left, I took it. That's the way I lived." Daniel further testified that he couldn't recall if he took cash or paid himself by checks and that his salary was slightly in excess of Wayne's salary. Wayne's salary for 1976 was $ 38,342. A review of the disbursements records prepared by the CPAs reveals that checks to Daniel or to "cash" total $ 5,160 for 1976. Based on our knowledge that Daniel's patients often paid him in cash, Daniel's haphazard recordkeeping, and our impressions from his testimony, we conclude that the balance of Daniel's "salary" for 1976 was taken in cash. Assuming Daniel's testimony to be accurate, e.g., that his "salary" was slightly in excess of Wayne's, we conclude and we have found that Daniel took cash draws totalling $ 40,000 from dental practice receipts during the period January 1, 1976, through November 11, 1976. These amounts are dental practice receipts that did not make it to the practice receipts account. As a result, we conclude that $ 40,000 is to be added to the receipts that the CPAs took into account. Daniel testified that his "salary" was used to pay his living expenses. In addition, in 1976, deposits were made to the Chesterfield *445 Bank accounts in the amount of $ 57,245.70. Of this total, $ 30,358.66 represents deposits which are either salaries or transfers from other accounts. The remaining $ 26,887.04 consists of unexplained deposits. By early 1976, Daniel knew that respondent had begun to focus on unexplained deposits to the Chesterfield Bank accounts in the course of the audit of Daniel's and Iris' earlier years' tax liabilities. It would not have taken much wisdom to recognize that, as a matter of elementary prudence, Daniel and Iris should keep records to identify deposits to the bank accounts of family members, and especially deposits to the Chesterfield Bank accounts. In January 1978, petitioners and respondent settled Daniel's and Iris' 1972, 1973, and 1974 income tax liabilities on the basis of unexplained deposits to the Chesterfield Bank accounts. It should have been painfully obvious to petitioners that they were vulnerable on this score and that they must gather and preserve evidence so that all the deposits could be explained. Nevertheless, almost half of the 1976 deposits to the Chesterfield Bank accounts remain unexplained. Petitioners made no effort at trial or on brief to provide an *446 explanation or argument. Taking into account the admonition in Cohan v. Commissioner, supra, we conclude that the unexplained 1976 deposits into the Chesterfield Bank accounts are to be treated as unreported receipts from Daniel's dental practice. Accordingly, we conclude that Daniel's total receipts from his dental practice was $ 277,711.22, instead of (1) the $ 210,824.18 reported on the 1976 tax return, and (2) the $ 286,050 determined in the notice of deficiency. We hold in part for respondent and in part for petitioners on this issue. II. 1975 -- Horse Racing Expenses
On their 1975 tax return, Daniel and Iris reported a loss of $ 11,000.45 incurred in the trade or business of horse racing. [32] In reporting this loss, Daniel and Iris reported gross receipts of zero and expenses of $ 11,000.45. In the notice of deficiency, respondent determined that Daniel has gross income from the trade or business of horse racing of $ 43,308. Respondent further determined *447 that Daniel had no expenses associated with the trade or business of horse racing. Consequently, respondent determined that Daniel had net business income from horse racing of $ 43,308 in 1975. Since this amount differs by $ 54,308.45, from the $ 11,000.45 reported loss, respondent determined that Daniel and Iris has underreported their income by $ 54,308.45. In an examination of Daniel's and Iris' books and records after the notice of deficiency was issued, respondent's agent concluded that Daniel had gross income of $ 86,031 in 1975 from the trade or business of horse racing. Respondent's agent also concluded that Daniel had deductions of $ 98,792.52 for 1975 attributable to the trade or business of horse racing. As a result of these conclusions, respondent's agent concluded that Daniel suffered a loss of $ 12,761.52 from the trade or business of horse racing for 1975. Furthermore, since Daniel and Iris had reported a loss of only $ 11,000.45, respondent's agent concluded petitioners were entitled to an additional loss deduction of $ 1,761.07 (the difference between $ 12,761.52 and $ 11,000.45). As a result of these conclusions by respondent's agent, the parties filed the following *448 stipulation: 3. (a) In the statutory notice of deficiency issued with respect to the 1975 tax year, respondent determined, per adjustment (b), that petitioners had unreported business income from horse racing in the amount of $ 54,308.45. Respondent now concedes this adjustment in full and stipulates that with respect to this adjustment petitioners did not under report horse racing income in the amount of $ 54,308.45 as claimed and that petitioners are entitled to deduct an unclaimed racing loss in the amount of ($ 1,761.07) for the 1975 tax year. At trial, petitioners' counsel made the following statement with regard to the above stipulation: The other issue relating to 1975 as set forth in 3A of the stipulation before the Court are [sic] conceded now by the petitioner orally in addition to the written concession by the respondent as contained in the stipulation.
Later, petitioners' counsel made the following statement to the Court: Before proceeding further, your honor, I have just been chided by my lawyer, Mr. Shaw, and may I ask leave of Court to withdraw my earlier concession as to the items contained in 3A defer a response to that concession until later on in the trial and *449 counsel on its own I can assure the Court will initiate a response to the Court. I'm not too sure why, I just got a short, terse note. Can I ask leave to do that your Honor?
On the last day of the trial, the Court made the following statement: Now, Mr. Klamen, there -- I'm not at all sure that the record reflects with specificity what petitioner's position is as to that claim with regard to 1975. You had initially conceded the -- all the amounts claimed in the petition in excess of what respondent had allowed, and then you indicted that perhaps you were not conceding it. In any event, you've not put in any evidence other than what's in the -- in the stipulations that might bear on it. What is petitioner's position?
Petitioners counsel responded as follows: There is no concession by the consid -- petitioner to that amount, your Honor. And, I think the record will show there is evidence dealing with that subject, and it will be brought to the brief, your Honor. We will see to that. In their petition, petitioners asserted that they were entitled to additional deductions for horse racing expenses of $ 87,780.55. This amount is about the difference between the $ 98,792.52 total horse *450 racing deductions and the $ 11,000.45 loss reported by Daniel and Iris on their tax return. On brief, petitioners contend tht "[t]he stipulations agreed upon by the parties, and evidence presented at trial was sufficient to overcome the presumption of the correctness of the deficiency notice. Respondent offered no evidence showing the petitioner was not entitled to the deduction calculated in the amount of $ 98,792.52". Petitioners also point to the testimony of respondent's agent wherein the agent testified that petitioners were entitled to $ 98,792.52 in horse racing expense deductions for 1975. After reviewing the testimony and exhibits, it is clear to us (and we have found) that the $ 98,792.52 in horse racing expense deductions properly offsets $ 86,031 in horse racing receipts, resulting in a net loss from horse racing activities of $ 12,761.52 in 1975. Since this loss exceeds by $ 1,761.07 the loss that Daniel and Iris reported, petitioners are entitled to this additional deduction, as the parties have stipulated. Petitioners' continued contention that they are entitled to further deductions, based on the ambiguity of the stipulation and their assertion in their petition *451 that they are entitled to these expenses, borders on the frivolous. We hold for respondent on this issue. III. 1976 -- Section 6653(a) -- Negligence, Etc.
Respondent contends that petitioners are liable for the negligence, etc., addition to tax for 1976 because (1) a large amount of gross income was not reported on Daniel's and Iris' 1976 tax return, (2) Daniel and Iris did not provide their return preparer with all the information necessary to accurately report their income, and (3) Daniel and Iris were being audited in 1976 with respect to Daniel's prior years' dental practice receipts and so Daniel and Iris understood their record-keeping obligations. Petitioners maintain that they are not liable for this addition because (1) there is no underpayment of tax and (2) they provided the CPAs "with all information available and engaged their services in verifying that information and compiling any additional information necessary." We agree with respondent. An addition to tax under section 6653(a)[33] is imposed if any part of any underpayment of tax is due to negligence or intentional disregard of rules or regulations. Petitioners have the burden of proving error in respondent's *452 determinations that this addition to tax should be imposed against them. Bixby v. Commissioner,58 T.C. 757, 791-792 (1972). Under section 6001[34] and section 1.6001-1(a) and (e), Income Tax Regs., a taxpayer must keep such permanent books of account or records as are sufficient to establish *453 the amount of gross income, deductions, credits, or other matters required to be shown on the tax return. The records that Daniel maintained *454 for 1975 and 1976 (through November 11, 1976) were woefully inadequate to establish the amount of gross income required to be reported on Daniel's and Iris' income tax returns. For 1976, Daniel and Iris did not use the records Daniel kept, such as they were, in the preparation of their tax return. Instead, because of Daniel's failure to maintain adequate records of his gross income from the dental practice for most of 1976, Daniel and Iris were forced to rely on the CPAs' reconstruction of Daniel's gross income in the preparation of their tax return. Because of the inadequacy of this reconstruction, Daniel and Iris underreported Daniel's 1976 dental practice receipts by almost $ 67,000. Daniel's failure to keep adequate records under these circumstances constitutes negligence. See Stovall v. Commissioner,762 F.2d 891, 895 (CA11 1985), affg. a Memorandum Opinion of this Court; [35]Zivnuska v. Commissioner,33 T.C. 226, 239-241 (1959). This negligence resulted in a substantial omission from income (even though the omission was less that that determined by respondent). There are no offsetting deductions or credits, and so this omission from income resulted in a deficiency for 1976 *455 which, in the instant case, is the same as an underpayment for 1976. Accordingly, we conclude that petitioners have an underpayment for 1976, and that this underpayment is due to negligence. Petitioners urge that Daniel's actions were reasonable in that Daniel hired the CPAs to reconstruct income and prepare the tax returns, Daniel was inexperienced in bookkeeping and accounting, and in instituting the one-write system Daniel followed carefully the suggestions and recommendations of the CPAs. In support of this argument petitioners cite Golden Nugget, Inc. v. Commissioner,T.C. Memo. 1969-149. Golden Nugget, Inc. is unlike the instant case in that the accounting system used by the taxpayers in Golden Nugget, Inc. was relied on to divide profits among three partners and to prepare the tax returns. Furthermore, the accounting system used in Golden Nugget, Inc. was sanctioned by a qualified public accountant. In the instant case, Daniel did not rely on the 1976 patient receipt records to either divide profits or to prepare his and Iris' tax return. The CPAs regarded them as useless in preparing the 1976 tax return. Furthermore, it was not until November 1976 *456 that Daniel hired the CPAs and began using the accounting system recommended by them. Daniel's responsibility to keep accurate records and file accurate returns was not met by his tardy hiring of the CPAs. See Metra Chem Corp. v. Commissioner,88 T.C. 654, 662-663 (1987); Pritchett v. Commissioner,63 T.C. 149, 174-175 (1974); Soares v. Commissioner,50 T.C. 909, 914 (1968). We hold for respondent on this issue. [36]
In order to take account of the foregoing and of concessions by both sides, Decisions will be entered under Rule 155.
Footnotes
1. Unless indicated otherwise, all section, chapter, and subtitle references are to sections, chapters, and subtitles of the Internal Revenue Code of 1954 as in effect for the years in issue. ↩
2. Of this amount, self-employment taxes under chapter 2 are $ 1,113.90; the remaining amount is chapter 1 income tax.↩
3. The amount of petitioners' liability for self-employment taxes for 1975 is derivative and depends both on the resolution of the issues for decision and on the settled issues. The parties have agreed by stipulation to provide similar derivative treatment to "an unclaimed deduction for sales tax". ↩
4. Rule 151(e)(3) provides, in part, as follows: In an answering or reply brief, the party shall set forth his objections, together with his reasons therefor, to any proposed findings of any other party, showing the numbers of the statements to which his objections are directed; in addition, he may set forth alternative proposed findings of fact. In the instant cases, although petitioners filed an answering brief, they failed to object to respondent's proposed findings of fact in accordance with Rule 151(e)(3). Consequently, we have assumed herein that petitioners have no objections to respondent's proposed findings of fact. Our findings of fact are, of course, based on the record in the instant cases. Unless indicated otherwise, all Rule references are to the Tax Court Rules of Practice & Procedure. ↩
5. During 1975 and 1976, petitioner Daniel A. Markman (hereinafter sometimes referred to as "Daniel") was married to Iris M. Markman (hereinafter sometimes referred to as "Iris"). Daniel and Iris filed joint Federal income tax returns for both years. Iris died before the petitions were filed; her estate is a petitioner in both cases. ↩
6. Daniel's horse racing income also was deposited into the practice receipts account. ↩
7. Offsetting this adjustment was a proposed $ 166.69 reduction in "Income - Schedule 'C'". 8. Offsetting this adjustment was a proposed $ 1,326.75 reduction in "Income - Schedule 'C'" and a proposed $ 1,744.99 increase in Schedule A deductions. ↩
9. In addition to this adjustment, there was a proposed $ 2,694.32 increase in "Income - Schedule 'C'" and an offset of a proposed $ 477.61 in Schedule A deductions. ↩
10. The unexplained deposits were made to accounts in the following names: Account Name
Amount↩
Ellis
$ 22,876.35
Ellis, Daniel, Iris
22,270.00
Ellis, Daniel
12,405.00
Wayne
2,911.30
Linda
1,081.13
$ 61,543.78
11. Respondent concludes that $ 15,601.40 was deposited into the account, $ 419.80 was explained as transfers, $ 11,285.31 was explained as Iris' salary checks, and $ 3,896.29 was unexplained. Our addition of the deposits shown on respondent's bank deposit analysis for this account shows the deposits totalling $ 15,781.40. Since our totals of transfers and Iris' salary checks agree with respondent's totals, this appears to result in unexplained deposits of $ 4,076.29. Neither side notes the $ 180 discrepancy. ↩
12. Respondent concludes that $ 9,138.13 was deposited into this account, $ 3,949.41 was explained as transfers, and $ 5,188.72 was unexplained. Our addition of the deposits shown as explained or unexplained on respondent's bank deposit analysis for this account shows the explained items totalling $ 4,179.51 and the unexplained items totalling $ 4,958.62. Neither side notes the $ 230.10 discrepancy. In addition, an unexplained deposit shown on the analysis as $ 450 on September 15, is shown on the bank statement for this account as $ 650. Neither side notes the $ 200 discrepancy. 13. The account's name was "Markman Educational Fund". ↩
14. This amount is a single deposit made on January 30, 1975. ↩
15. This amount is the total of the unexplained deposits into this account through August 1975. (As we have found, supra,↩ Wayne began to work in Daniel's dental practice in September 1975.) Respondent states on brief that the unexplained deposits for this period totalled $ 3,647.71. Respondent's total includes two $ 100 deposits on August 29, 1975. However, our examination of the bank statement shows that one of these deposits was made on September 2. The remaining $ 0.10 discrepancy between respondent's total and our finding is unexplained.
16. The statements for Ellis' account no 10-6737-7 were mailed to a Kansas City, Missouri, address from September 1975 through August 1976. The statements for Ellis' and Daniel's joint account were mailed to an Overland Park, Kansas, address from January 1975 through July 1975. ↩
17. Daniel's and Iris' 1972 tax return showed expenses of $ 42,919.93; the $ 0.35 difference is unexplained, but would not affect the results under respondent's analysis. ↩
18. The notice of deficiency states the quotient as $ 133,083.37. However, the adjustment to income made in the notice of deficiency is consistent with the correct quotient, shown supra.↩
19. On opening statement at trial, respondent conceded that the proper adjustment should be $ 73,576.29. On answering brief, respondent made a further concession, that the proper adjustment should be $ 73,288.84. ↩
20. The stipulated bank statements for this account show deposits totalling $ 28,461.23 in 1976. Our finding is in accord with respondent's unobjected to requested finding of fact (see n. 4, supra↩). Respondent has not explained the difference of $ 0.46.
21. The stipulated band statements for this account show deposits totalling $ 20,780.74 in 1976; they do not include the statement for the period March 23 through April 26. Our finding is in accord with respondent's unobjected-to requested findings of fact (see n. 4, supra↩). Respondent has not explained the March 23 through April 26 deposits and the difference of $ 0.03. 22. Daniel engaged in the practice of racing "culls" or horses deemed unsuitable for sale as race horses by the breeder. Daniel paid one-half of the horse's winnings, if any, to the breeders. Daniel paid all expenses of the racing activity. Daniel did not gamble on the outcome of horse races. The parties do not dispute that Daniel was in the trade or business of horse racing. 23. On their 1976 tax return, petitioners reported that Daniel's horse racing activities produced $ 129,248 income and $ 136,974 expenses, for a net loss of $ 7,726. In his notice of deficiency, respondent did not adjust any of the 1976 horse racing activity amounts. ↩
24. On the notice of deficiency, Form 886-A, Explanation of Items, respondent concluded with "Therefore, your taxable income is increased $ 43,308.00." However, the notice of deficiency Form 5278, Statement -- Income Tax Changes, shows "b. Business Income -- Horse racing $ 54,308.45." It is clear that the latter amount is the amount of the intended adjustment. ↩
25. Taking as our text the substance of Helvering v. Taylor,293 U.S. 507 (1935), we conclude as follows: 1975: It may be that respondent's formula approach underlying the notice of deficiency was "arbitrary", but petitioners have failed to show that the result produced by respondent's approach was "excessive"; also there is evidence supporting respondent's conclusion, and so we agree with respondent's conclusion. 1974:↩ Respondent's decision to base the notice of deficiency on Daniel's records clearly was ot "arbitrary", but we are convinced that respondent's determination was "excessive", and so we provide some relief to petitioners under the "Cohan" rule. 26. SEC. 61. GROSS INCOME DEFINED. (a) General Definition. -- Except as otherwise provided in this subtitle [i.e., subtitle A, relating to income taxes], gross income means all income from whatever source derived, including (but not limited to) the following items: * * * (2) Gross income derived from business;↩
27. Medd v. Commissioner,T.C. Memo. 1968-244. As we made clear in Estate of Hill v. Commissioner,59 T.C. 846, 857 (1973), this Court's understanding of the standards to be applied is essentially the same as that enunciated by the Court of Appeals in Lark Sales Company v. Commissioner,437 F.2d 1067, 1078↩ (CA7 1970). 28. The parties' briefs lead us to empathize with Tevye in Fiddler on the Roof (Joseph Stein, copyright (1964)) wherein the following exchange takes place (Best American Plays, Sixth Series 1963-1976, (Crown Publishers, Inc., 1971) at 407-408): MORDCHA. Aha! The university. Is that where you learned to criticize your elders? PERCHIK. That's where I learned that there is more to life than talk. You should know what's going on in the outside world. MORDCHA. Why should I break my head about the outside world? Let them break their own heads. TEVYE. He's right. As the Good Book says, "If you spit in the air, it lands in your face." PERCHIK. That's nonsense. You can't close your eyes to what's happening in the world. TEVYE. He's right. AVRAM. He's right and he's right? How can they both be right? TEVYE. You know, you're also right. ↩
29. See table 6, supra, and the accompanying text. Note 15, supra,↩ explains why our findings are $ 100.10 less than respondent's contentions. 30. As a result f numerous amendments, the $ 750 amount has been increased to $ 1,900 for 1987. See subsections (c)(1)(A) and (d)(1)(A) of section 151 of the Internal Revenue Code of 1986↩. 31. Respondent also disallowed $ 87,168.52 of Daniel's claimed 1975 dental practice expenses. Respondent concedes this in full, and also concedes that petitioners are entitled to deduct $ 2,487.29 that had not been claimed on the tax return.↩
32. Markman was not involved in betting on the horses. See n. 21, supra. Groetzinger v. Commissioner,    U.S.   , 107 S.Ct. 980↩ (1987), and section 165(d) (both dealing with deductions for gambling losses) are not implicated. 33. SEC. 6653. FAILURE TO PAY TAX. (a) Negligence or Intentional Disregard of Rules and Regulations with Respect to Income or Gift Taxes. -- If any part of any underpayment (as defined in subsection (c)(1)) of any tax imposed by subtitle A * * * is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment.
[The subsequent amendments of this provision (by sec. 101(f)(8) of the Crude Oil Windfall Profit Tax Act of 1980 (Pub. L. 96-223, 94 Stat. 229, 253), sec. 722(b)(1) of the Economic Recovery Tax Act of 1981 (Pub. L. 97-34, 95 Stat. 172, 342), sec. 107(a)(3) of the Technical Corrections Act of 1982 (Pub. L. 97-448, 96 Stat. 2365, 2391), and secs. 1503(a) and 1503(d)(1) of the Tax Reform Act of 1986 (Pub. L. 99-514, 100 Stat. 2085, 2742-2743)) do not apply to the instant case.] ↩
34. SEC. 6001. NOTICE OR REGULATIONS REQUIRING RECORDS, STATEMENTS, AND SPECIAL RETURNS. Every person liable for any tax imposed by this title, or for the collection thereof, shall keep such records, render such statements, make such returns, and comply with such rules and regulations as the Secretary or his delegate may from time to time prescribe. Whenever in the judgment of the Secretary or his delegate it is necessary, he may require any person, by notice served upon such person or by regulations, to make such returns, render such statements, or keep such records, as the Secretary or his delegate deems sufficient to show whether or not such person is liable for tax under this title.
[The subsequent amendments of this provision (by sec. 1906(b)(13)(A) [sic] of the Tax Reform Act of 1976 (Pub. L. 94-455, 90 Stat. 1520, 1834), by sec. 501(a) of the Revenue Act of 1978 (Pub. L. 95-600, 92 Stat. 2763, 2878) and by sec. 314(d) of the Tax Equity and Fiscal Responsibility Act of 1982 (Pub. L. 94-248, 96 Stat. 324, 605)) do not apply to the instant case.] ↩
35. T.C. Memo. 1983-450↩. 36. Respondent has chosen not to determine an addition to tax under section 6653(a) for 1975, nor make a claim for such an addition to tax in his answer or otherwise at or before the hearing in these cases. The record would support such an addition to tax for 1975 even if the burden of proof fell upon respondent. See Rule 142(a). Since respondent has not claimed the addition for 1975, we do not grant it. Sec. 6214(a); Koufman v. Commissioner69 T.C. 473↩ (1977).